**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

February 28, 2022

**BY EMAIL & ECF**

Honorable Sidney H. Stein
Senior U.S. District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    **United States v. Delowar Hossain**
            **(S1) 19 Cr. 606 (SHS)**

Dear Judge Stein:

       The Court should sentence Delowar Hossain to no more than 72 months' imprisonment followed by three years' supervised release. Before this case, Mr. Hossain had never been arrested, and there is zero indication that he was a violent person capable of harming anyone. To the contrary, Mr. Hossain, the child of Bengali immigrants, was a hardworking son and brother who, after turning to Islam following years of personal tumult, developed delusions of grandeur and a self-destructive desire to escape from his stressful life. In all respects, the conduct behind Mr. Hossain's conviction was an aberration that did not put anyone— including U.S. servicepersons in Afghanistan—in any real danger. Indeed, without any evidence illustrating how, when, and through what means Mr. Hossain would have traveled from Thailand to Afghanistan to join the Taliban (a group with which Mr. Hossain had no connection or contact whatsoever), it simply strains credulity to treat him as if he came even remotely close to killing anyone.

       But that is exactly what United States Probation proposes in its Pre-Sentence Report. Probation's recommended sentence of 300 months' imprisonment (based on guidelines of 420 months' incarceration) is completely disproportionate to what Mr. Hossain actually did and the circumstances surrounding his months-long engagement with two trained confidential FBI informants who facilitated and encouraged his actions. Probation's recommendation also ignores mitigation stemming from Mr. Hossain's family life and upbringing, and it otherwise fails to distinguish Mr. Hossain from convicted terrorists, their sympathizers, and bona fide

violent criminals who actually harmed (or came close to harming) real people. 18 U.S.C. § 3553(a)(1). The recommendation also neglects Mr. Hossain's perfect compliance with strict home incarceration for the nearly 16 months he was on pre-trial release and does not account for the hellish conditions of confinement Mr. Hossain endured at the now-defunct MCC New York before he was bailed and since his post-trial remand to Essex County Correctional Facility. 18 U.S.C. § 3553(a)(2)(A) and (a)(2)(B). Lastly, and as set forth in Dr. Edward Fernandez's report (filed under seal and attached as Exhibit A), Mr. Hossain likely suffers from mental health issues that affect his decision-making and judgment, and that make him particularly susceptible to delusional thinking. Because Mr. Hossain is unlikely to receive appropriate mental health care while in BOP custody, a shorter term of imprisonment with rigorous mental-health conditions on post-release supervision is appropriate. 18 U.S.C. § 3553(a)(2)(D).

I. **Delowar Hossain's Personal Background and Record**

   A. **Mr. Hossain is a naturalized U.S. citizen and father of three who has lived in New York City for most of his life in relative poverty and obscurity.**

Delowar Hossain was born on August 15, 1985, in Bangladesh and is a naturalized United States citizen. Mr. Hossain has always lived in New York City and primarily in the same apartment as his parents and siblings. Mr. Hossain grew up in a low-income household and his parents, who were present for every day of his trial, work in low-income jobs: his father was an Uber driver and his mother is a sales associate. Mr. Hossain's father has significant health issues, including diabetes and heart disease. Although he had stopped smoking for some time, Mr. Hossain's father took up the habit again as a result of the stress of this case.

Mr. Hossain has two younger brothers, Salahuddin and Naim, who currently live with his parents. Mr. Hossain is very close with his brothers and continues to correspond with them daily. As the oldest sibling, Mr. Hossain shouldered many of his family's burdens and responsibilities, giving them priority over his own tribulations. As Salahuddin wrote in his letter to the Court:

> We grew up in a small 1 bedroom apartment in Lower East Side, Manhattan. We have been very close our whole lives. Delowar has always been a helpful, inspiring, hardworking and passionate person. He has always paid most of his attention in school to achieve the highest grades. This dedication was fueled by a hard childhood. Growing up with immigrant parents in America came with plenty of struggles. These struggles were financial, mental, social and emotional.

2

> Financially, my family was under the poverty line which caused Delowar to want to become more helpful and responsible. He started working at a young age through afterschool programs and when he reached working age he would always bring home his paychecks to help our family. Mentally, he did not have a normal childhood as he always got bullied in school for being different and not being able to afford things other children had. However, he did not let this affect his relationship with our parents and siblings because he knew his struggles were beyond what people could understand. Delowar would always console me whenever I went through similar struggles and would guide me through those times. He would always share his clothes with me or tell me that he would help me get whatever I needed in life to the best of his abilities. He was very selfless when it came to his family. Whenever there was a holiday or any event he would always provide gifts for everyone and not exclude anyone.

Exhibit B at 1-2.

      Eventually, Mr. Hossain graduated from Marta Valle High School in Manhattan and, in 2009, he received his Bachelor of Science degree in criminal justice from Monroe College in the Bronx. Mr. Hossain was on the honors list and was in the top ten of his graduating class. During this time, Mr. Hossain was not particularly religious. He was culturally Muslim, meaning that he technically knew how to pray and was familiar with Islam's basic tenets, but he did not pray five times a day, regularly keep fasts, or attend the mosque every Friday. And as a cultural Muslim, Mr. Hossain did things that Islam technically forbids. He drank alcohol, smoked weed, and was sexually promiscuous.

      When Mr. Hossain was around 23 or 24 years old, he met his first wife, Moksha Mahant. When Mr. Hossain met Moksha, she was Hindu, and her parents adamantly disapproved of their relationship.[1] Mr. Hossain and Moksha were undeterred, however, and insisted on getting married despite her parents' stern opposition. Mr. Hossain's family, while wary of his new relationship, took a very strong liking to Moksha and welcomed her to live with them when she was essentially kicked out of her home for dating Mr. Hossain.

      On November 27, 2013, Moksha and Mr. Hossain had a daughter, ▮▮▮▮▮▮. While they were both thrilled at ▮▮▮▮▮▮'s birth, Mr. Hossain and Moksha were under a tremendous amount of stress. They were both living with Mr. Hossain's

---

[1] An article by Frederic M. Bennett from the 1958 Issue of The Atlantic succinctly summarizes the pervasive tension between Hindus and Muslims on the Indian subcontinent, which persists to the present day. See Frederic M. Bennett, Muslim and Hindu: The Sensitive Areas, The Atlantic (February 1958 Issue), available at: https://www.theatlantic.com/magazine/archive/1958/02/muslim-and-hindu/305462/.

parents and siblings in a tiny apartment, and the addition of a newborn baby stretched thin their already-bare resources. The situation also took a toll on Mr. Hossain's relationship with Moksha. He struggled to be the supportive partner Moksha needed as she battled her own postpartum issues. And he found himself working endlessly to support not only his wife and kids, but also his parents and siblings. Worse, and shortly before ▮▮▮▮'s birth, Mr. Hossain had started another relationship with a woman named Sharmin. Although he had promised himself to end the infidelity after ▮▮▮▮ was born, Mr. Hossain did the exact opposite, and instead ended things with Moksha when ▮▮▮▮ was around six months old.

Mr. Hossain's parents were outraged with him, as was Moksha. Having essentially chosen Mr. Hossain over her own family, Moksha saw this as the ultimate betrayal, and Mr. Hossain's parents agreed. Mr. Hossain soon moved out of his parents' apartment, leaving Moksha and ▮▮▮▮ behind, and he began living with Sharmin. In January 2015, and following their Islamic marriage,[2] Mr. Hossain and Sharmin had a daughter named ▮▮▮▮. ▮▮▮▮'s birth ushered in a new era of stress for Mr. Hossain. Forced into a cramped living space on the third floor of a house in the Bronx, Sharmin and Mr. Hossain were constantly at each other's throats. Worse, Sharmin would become (understandably) jealous whenever Mr. Hossain went to his parents' house to visit Moksha and ▮▮▮▮. Things became so tense that Mr. Hossain stopped telling Sharmin the truth about his whereabouts. And on top of everything, Mr. Hossain was working around the clock to support his two wives, two kids, parents, and two siblings.

### B. Mr. Hossain's changing religiosity, desire to return to Bangladesh, and relationship with Suhail.

Near the beginning of 2016, Mr. Hossain experienced a religious awakening. One evening, while Sharmin's father was praying, he observed his daughter ▮▮▮▮ following suit. Struck by ▮▮▮▮'s imitation of her grandfather, Mr. Hossain thought more critically about the kind of example he was setting for his children. He felt compelled to learn more about Islam and to embrace a more pious and conservative lifestyle. Mr. Hossain began regularly studying the Quran and attending prayers at the mosque. While he drove for Uber, Mr. Hossain would listen to religious lectures and podcasts, and began reading third-party texts and materials interpreting Islam.

Mr. Hossain's renewed religious fervor coincided with a strong desire to leave the United States and return to Bangladesh. For Mr. Hossain, his prior infidelities and exposure to drugs and alcohol were products of his surroundings—the inevitable result of living in a non-Muslim-majority country. He became obsessed with moving "back home," and would constantly discuss the matter with Sharmin and his parents, haranguing them about leaving the United States. But nobody else

---

[2] Mr. Hossain has a formal, civil marriage with Moksha and a religious marriage with Sharmin.

4

was enthusiastic about returning to Bangladesh. Mr. Hossain's parents were content in the United States, and neither Sharmin nor Moksha could ever envision living outside of New York City. Everyone in Mr. Hossain's life thought moving back to Bangladesh was an awful idea, and they tuned him out.

Unfortunately, the more Mr. Hossain's family ignored his pontificating and incessant talk about leaving the United States, the more he dug in his heels. When he was not driving Uber, Mr. Hossain would spend his weekends with various "Dawah" groups in the Bronx and Manhattan. Specifically, Mr. Hossain would meet up with other Muslims and proselytize in various public places, like subway stations and parks. Mr. Hossain and his cohorts would engage with curious passerby with the goal of converting them to Islam. It was around this time that Mr. Hossain grew out his beard and began to dress differently, exchanging his jeans and t-shirts for a long white traditional "thobe," which he began wearing daily, even when he would drive his Uber and Lyft customers.

As established at trial, Mr. Hossain met Suhail (one of the undercover FBI informants) in April 2018 at a mosque in the Bronx. At that time, Mr. Hossain had been fervently studying Islam for two years and was an enthusiastic evangelist who never missed an opportunity to correct others and their misinterpretations. When he met Suhail, Mr. Hossain believed him to be an impressionable and confused Yemeni man who needed Mr. Hossain's guidance. Mr. Hossain recalls that in his first meetings with Suhail, Suhail complimented Mr. Hossain on his thobe and beard, remarking that Mr. Hossain "looked like the sunna,"[3] and extolled the virtues of ISIS and Anwar al-Awlaki. Believing that Suhail was genuinely interested in ISIS and al-Awlaki, Mr. Hossain took it upon himself to show Suhail why ISIS and al-Awlaki represented deviations from the true Islam, which embraced a different conception of jihad and the utility of "holy war." It was in this context that Mr. Hossain and Suhail became friends.

At around the same time Mr. Hossain met and began spending time with Suhail, he was not only feeling alienated from his family, but he was also facing down another tremendous stressor: a third child, ▮▮▮▮▮, to whom Sharmin gave birth on August 8, 2018. During the spring and summer of 2018, the addition of a third child proved a formidable obstacle for Mr. Hossain. His relationship with Sharmin suffered and he became even more stressed out about his mounting responsibilities to three children, two wives, his parents, and his siblings. As an escape from the pressure, Mr. Hossain focused even more intently on Islam and on his proselytizing—two aspects of his life over which he felt he had ultimate control. Central to this was Suhail, who—as far as Mr. Hossain was concerned—similarly wanted to leave the United States and live in a Muslim-majority country. Specifically, and before his communications with Suhail were recorded, Mr. Hossain

---

[3] Sunna refers to the words, actions, and pre-Islamic practices of the Prophet Muhammad.

5

recalls Suhail boasting about his own family and how some of them had left the United States to wage jihad throughout the Middle East. Suhail had even shown Mr. Hossain ISIS propaganda videos and claimed that many in the Yemeni community supported ISIS. Mr. Hossain had a strong reaction to Suhail's perceived interest in ISIS. He recalls telling Suhail about how ISIS's message was a deviation from true Islam and explaining his belief that ISIS was used by the United States Government as a pretext to invade and occupy Muslim countries. Mr. Hossain saw it as his responsibility to correct Suhail's course away from ISIS, and also enjoyed the attention Suhail paid him; he thought he had finally found someone who was as disillusioned as he was about life in the United States.

 In the weeks leading up to ███████'s birth, Mr. Hossain and Suhail spoke with one another on the phone and would meet up at Suhail's deli, which was located near Mr. Hossain's home with Sharmin in the Bronx. Mr. Hossain recalls Suhail as being very warm, caring, and hospitable, and that Suhail made him feel valued. During their talks, Mr. Hossain would confide in Suhail his strong desire to leave the United States, but explained that he could not do it alone because he lacked the resources and wherewithal. It is against this backdrop that Mr. Hossain showed up to Suhail's deli in September 2018 and purportedly discussed with him a "plan" to attack an army recruitment center in the Bronx—a conversation that was not recorded and that did not mature into anything. In fact, by the time the FBI began recording Suhail's conversations with Mr. Hossain in mid-September, it became clear that Mr. Hossain had no interest in attacking anyone or anything in the United States and that his real interest was in relocating abroad, including to Egypt or Afghanistan.

 Through December 2018, and as revealed by the FBI's surreptitious recordings of Mr. Hossain's communications with Suhail, Mr. Hossain talked a lot about leaving the United States and about joining the Taliban. At the same time, Mr. Hossain did nothing but talk. Neither he nor Suhail took any steps to finalizing any plans to travel to Egypt, Afghanistan, Pakistan, or anywhere else. Neither of them purchased any equipment, gear, or plane tickets. Crucially, Mr. Hossain—who had never been arrested before and had no history of violence or other criminality— did not buy any weapons, try to buy weapons, or seek weapons training. He also never sought contact with any bona fide Taliban members or members of any other terrorist organization. To the contrary, Mr. Hossain was often flaky and difficult to get ahold of, so much so that at various times the FBI would direct Suhail to renew contact with Mr. Hossain.

 Indeed, Suhail's efforts were ineffectual enough that the FBI saw fit to assign another confidential human source named Abu Bakr to pursue Mr. Hossain. It was only after Abu Bakr joined the investigation that the plans started to mature and that Mr. Hossain began taking action, like purchasing walkie talkies, camping equipment, and plane tickets to Thailand. Nevertheless, at no point did Mr. Hossain

6

have a concrete plan about how to ultimately travel to Afghanistan or how to establish contact with the Taliban, which, as explained by the Government's own Taliban expert, was a likely prerequisite to actually joining the group. Further, while the Government presented evidence at trial that Mr. Hossain sought to encourage others to travel with him, including a young man named James Bradley, nobody else besides Mr. Hossain, Abu Bakr, and Suhail went to the airport on July 26, 2019. In fact, Mr. Bradley was so disillusioned and fed-up with Mr. Hossain that he cut all ties with him in the spring of 2019, only to be arrested a year later in connection with his own plot to join ISIS with another woman who was not an FBI informant.

### C. Upon Mr. Hossain's arrest, he endured hellish confinement conditions that culminated in his court-ordered release to pretrial supervision in the summer of 2020.

Mr. Hossain was arrested at JFK airport on July 26, 2019, before he was able to board a flight to Thailand. His suitcases contained designer clothes, perfumes, and other items that are not readily reconcilable with a plot to join the Taliban. Notwithstanding the Government's position (based on Mr. Hossain's recorded communications with Suhail and Abu Bakr) that Mr. Hossain had concocted an elaborate plan to mask his true intentions of joining the Taliban, there were no flight plans, tickets, itineraries, maps, or any other items in Mr. Hossain's possession that suggest he would have ultimately traveled to Afghanistan from Thailand.

Following his arrest, Mr. Hossain was detained at MCC New York and immediately placed in solitary confinement. For the next month, until August 26, 2019, Mr. Hossain was confined to a single cell with a shower inside. He was not allowed to leave his cell except for legal visits and was deprived of a toothbrush for the first three weeks, forced to brush his teeth with his index finger. Mr. Hossain was also deprived of other basic necessities, including the ability to use the phone to call his family, and had to rely on his attorneys to communicate with his parents, siblings, and children. At times, he was even cutoff from his attorneys, especially in the days surrounding Jeffrey Epstein's suicide at MCC on August 10, 2019.

Eventually, Mr. Hossain was moved to another unit, 9 North, where he remained until December 2019. While on 9 North, Mr. Hossain was subjected to intermittent lockdowns attributable to other inmates' actions in the unit, including assaults and drug use. Having never been incarcerated before, Mr. Hossain recalls watching with horror other inmates fighting amongst themselves over the telephone and other privileges. Every time a fight broke out, the unit would be locked down, and Mr. Hossain was deprived of a shower and hot meals, forced to eat a bagged breakfast, lunch, and dinner for days at a time. In addition, many of the phones and computers available to inmates for social calls and legal work were frequently

7

broken or dysfunctional, creating substantial obstacles for Mr. Hossain's receipt and review of discovery. Mr. Hossain also reports that 9 North was infested with roaches and small rodents, including mice.

In January 2020, Mr. Hossain was transferred to a dormitory-styled unit, 11 South. Upon his arrival, he learned that the unit had caught fire a couple days prior and that there was not a bunk available for him. Instead, Mr. Hossain was forced to sleep on a cot on the ground for three weeks while other inmates and contractors worked to clean up the smoke residue on the walls. During his time on 11 South, Mr. Hossain continued to have limited access to his family and to the phones, sometimes for weeks at a time. It was all Mr. Hossain could do to get a message out through his then-retained counsel to reassure his family that he was still alive.

In late January 2020, the entire MCC was locked down and turned upside down over a report that a loaded gun had been smuggled into the facility. This was a particularly terrifying time for Mr. Hossain, as the jail was shut down for six weeks with no visits or phone calls. Like everyone else in the jail, Mr. Hossain was deprived of access to commissary and hot meals, and instead he received brown-bagged breakfasts, lunches, and dinners. He was even deprived of regular access to the showers and bathrooms, forced to spend days at a time trapped with his own filth. Worse, during the gun-related lockdown, Mr. Hossain began hearing reports of a novel coronavirus and the likelihood that it was silently proliferating throughout New York City. Indeed, just as the gun-related lockdown was winding down in March 2020, it was becoming clearer that COVID-19 presented an unprecedented threat to public health and safety, particularly for those imprisoned who could not avail themselves of the masking, social distancing, and hygiene measures championed by public health officials. In an effort to mitigate the spread of COVID-19 inside MCC, officials imposed an indefinite lockdown and suspended all visitation whatsoever.

Between the gun and coronavirus-related lockdowns, Mr. Hossain was essentially locked in his cell for six months straight, from the end of January 2020 to his release to pretrial supervision on July 14, 2020. During those months, Mr. Hossain spent no more than 45 minutes a day, if at all, outside of his cell, during which time he had to choose between calling his family or his attorney and taking a shower. The conditions still cause Mr. Hossain to experience nightmares.

On July 13, 2020, and in response to Mr. Hossain's application for bail, the Court held a hearing. During that hearing, the Court denied Mr. Hossain's previously-retained counsel's application for CJA appointment and reappointed the Federal Defenders of New York to represent Mr. Hossain. In addition, the Court ordered Mr. Hossain released to home incarceration—the strictest pre-trial release conditions available—on the strength of a $250,000 personal recognizance bond cosigned by five financially responsible people. And in granting Mr. Hossain's

8

application, the Court expressly rejected the Government's contention that Mr. Hossain posed too great a risk to public safety to be released, determining, inter alia, that the Government had not established dangerousness by clear and convincing evidence "given the fact that [Mr. Hossain] has no prior criminal history and looks like he was always saying that he wouldn't do anything on American soil." Hrg. Tr. at 33-34 (Dkt. No. 64).

After obtaining his five family-member cosigners' signatures to his $250,000 bond, Mr. Hossain was released from MCC New York forthwith and remained on pretrial supervision until his conviction and remand on October 8, 2021. For nearly 16 months, Mr. Hossain was on bail without a single infraction. He regularly attended meetings at the Federal Defenders' office and communicated appropriately with his Pretrial Officers Bernisa Mejia and Mohammed Ahmed. Significantly, Mr. Hossain sought and obtained nine one-time modifications to his bail conditions to permit him to leave his parents' apartment and to spend time with his family during various holidays and gatherings. The Court even allowed Mr. Hossain to spend the night at one of his cosigner's homes during one religious holiday. At no point was Mr. Hossain in violation of his release conditions; he left and returned home on time and scrupulously adhered to the Court's rigorous conditions and requirements.

Further, and as evidenced by his family's readiness to cosign a hefty personal recognizance bond on his behalf, Mr. Hossain maintains a close connection with his family despite his conviction and present circumstances. The love Mr. Hossain's family and friends still feel for him are also illustrated by the letters of support attached to this memorandum. See Exhibit B. These letters of support present a contrast to the angry picture of Mr. Hossain reflected in the Pre-Sentence Report and in the Government's theory of the case at trial.

### D. Mr. Hossain's traumatizing post-trial confinement conditions at Essex County Correctional Facility.

Following the jury's guilty verdict on October 8, 2021, Mr. Hossain's bail was revoked and he was remanded to the custody of Essex County Correctional Facility in Doremus, New Jersey. There, he was immediately placed in a large holding room with ten other inmates, which contained benches and a toilet. Without a bed, Mr. Hossain slept on the floor for four days and until he was placed in a cell in the jail's covid-related quarantine unit. For the next two weeks, Mr. Hossain was kept inside of his cell for almost 24 hours a day, with brief ten to 15-minute-long reprieves to make phone calls and take a shower. During the quarantine, Mr. Hossain lost approximately ten pounds.

Since his release from quarantine, Mr. Hossain has had a dreadful experience inside Essex. For example, on or about January 18, 2022, a psychiatrist at the

9

facility went to see Mr. Hossain. According to the psychiatrist, the facility had been receiving complaints that Mr. Hossain had been acting strangely, including by pacing around the dormitory-style unit and crying at night. Mr. Hossain insisted that his behavior was being misinterpreted, and that he had been walking to pass the time and crying on occasion because he missed his family. He also explained that he kept early hours to keep a prayer schedule, and that he had not been talking to himself; he had simply been praying. Mr. Hossain read the first chapter of the Quran to the psychiatrist to show her, and she reassured him that if the concerns stemmed from his religious practice, then there was no issue.

About 30 minutes later, Mr. Hossain was confronted by a sergeant who was also accompanied by the facility's on-site imam. The imam helped Mr. Hossain pack up his property and told Mr. Hossain that his possessions would be securely kept while he was relocated. Mr. Hossain was extremely confused and had no idea what was going on. The imam escorted Mr. Hossain to the sergeant, and was then transferred to "the box," i.e., solitary confinement.

That whole night Mr. Hossain stayed awake and recited Quran to himself. At one point, a corrections officer banged on Mr. Hossain's cell door and threatened to open up all the cells so that the other inmates could beat up Mr. Hossain for praying and making so much noise. Mr. Hossain continued to pray.

The next morning, on or about January 19, 2022, two officers came to Mr. Hossain's cell, removed him, and took him to another cell in another unit. There, the officers told Mr. Hossain to face a wall and strip naked, instructing him to hand over his clothing one article at a time. After Mr. Hossain stripped, the officers ordered him to get dressed and to stand by the door when he was ready. Mr. Hossain got dressed and waited by the door, but the officers did not open it. About 20 minutes passed before Mr. Hossain knocked on the cell door to let the officers know he was ready and waiting.

Suddenly, two different officers from the ones who strip-searched Mr. Hossain entered his cell and ordered him to "lock in." Mr. Hossain was terrified and completely confused as to what was going on. Worse, Mr. Hossain heard other inmates on the floor start yelling, "Yo, don't hurt him," and "You don't have to hurt him." Fearing that he was about to be assaulted by the officers, Mr. Hossain panicked and began to hyperventilate, frozen in place.

The officers then grabbed Mr. Hossain by the arms and forced him deeper into the cell. Petrified that he was about to be beaten or killed, Mr. Hossain tensed up and began to breathe even harder. He became even more frightened when additional officers arrived, forced Mr. Hossain to the ground, handcuffed him, and pepper sprayed him directly in the face. In excruciating pain, Mr. Hossain was dragged to a shower and forced by the officers to keep pressing the hot water

button. Mr. Hossain's whole body was burning—some from the scalding hot water coming from the shower, the rest from the pepper spray making its way through every orifice on his face and head. At some point, Mr. Hossain recalls being injected with something by a nurse, but to this day he has no idea what she administered. Two days later, on Friday, January 21, 2022, an officer appeared with some paperwork and told Mr. Hossain that he received zero days' detention and that, "We forgive you."

### E. As reflected in the attached report from clinical psychologist Dr. Edward Fernandez, Mr. Hossain likely suffers from ▓▓▓▓ ▓▓▓▓▓▓ and has a tendency towards delusional thinking.

As an aid to sentencing, a forensic psychological evaluation of Mr. Hossain was conducted over the course of two days by Dr. Edward Fernandez, PsyD., a licensed clinical psychologist and Clinical Director at Five Borough Forensics. See Exhibit A. Dr. Fernandez observed that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Id. at 3. Dr. Fernandez concluded that Mr. Hossain "likely meets diagnostic criteria for ▓▓▓▓▓▓▓▓▓▓▓▓."

Dr. Fernandez's conclusions are critical to fully understanding Mr. Hossain's mental state at the time of the charged events. Dr. Fernandez opines that "Mr. Hossain's symptoms may be associated with his criminal justice involvement as his emotional dysregulation could have contributed to vulnerability, leading him to seek validation and comfort from others. Further, in the context of heightened emotional sensitivity and significant impulsivity, it is reasonable to assume Mr. Hossain might have been more suggestible while provided with extremist beliefs from individuals of whom he sought a sense of connectedness." Id. at 9.

Dr. Fernandez's conclusions and opinions are consistent with the defense theory that when Mr. Hossain met Suhail and later Abu Bakr, he was alienated from his family and vulnerable to the time, attention, and adoration Suhail and Abu Bakr gave him. They fed his inflated ego and tolerated his self-importance. Mr. Hossain developed, in his mind, deep connections with these men who emboldened his religious fervor and delusional thinking.

Dr. Fernandez opines that "given his culture and religious beliefs, Mr. Hossain likely did not recognize the significance of his symptoms and lacked access to mental health services." Id. at 8. He believes that Mr. Hossain would "benefit most from treatment within his faith-based community that is understanding of mental health." Id. at 9. He also recommends that Mr. Hossain be assessed for appropriate psychiatric medications. Id.

11

## II. The U.S. Sentencing Guidelines Present an Inappropriate and Inaccurate Lodestar for the Court's Determination of an Appropriate Sentence for Mr. Hossain.

The Pre-Sentence Report's calculation of Mr. Hossain's advisory guidelines range is flawed. In recommending 300 months' imprisonment, Probation relied on a rote application of the United States Sentencing Guidelines' so-called "terrorism enhancements" and sought to hold Mr. Hossain accountable as if he had killed or attempted to kill someone. Not only is such a recommendation disproportionate and greater than necessary to achieve the statutory goals of sentencing under 18 U.S.C. § 3553(a), but it is also based on guidelines provisions that are either inapplicable or unenforceable on policy and due process grounds. The Court should reject Probation's guidelines calculation.[4]

### A. Probation's proposed cross reference to attempted murder to form a base offense level of 33 is wrong.

According to Probation, "because the object of the intended offense would have constituted first degree murder," Mr. Hossain's base offense level is 33 under § 2A2.1. This analysis fails.

The Government bears the burden of proving by a preponderance of the evidence that a defendant committed "another felony offense" so as to trigger a Guidelines enhancement. See United States v. Legros, 529 F.3d 470, 474 (2d Cir. 2008). "Each element of the underlying . . . offense must be established." Id. (citing United States v. Betts, 509 F.3d 441, 445 (8th Cir. 2007)). The Government has not proved by a preponderance of the evidence that the material support Mr. Hossain was convicted of attempting to provide is tantamount to attempted first degree murder because it has not proved that Mr. Hossain had the specific intent to kill anyone.

Federal law defines murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a); see United States v. Whiteside, 207 F. Supp. 3d 311, 320 (S.D.N.Y. 2016). First degree attempted murder, "requires a 'willful, deliberate, malicious, and premeditated [attempted] killing.'" Whiteside, 207 F.3d at 320 (quoting 18 U.S.C. § 1111(a)).

Under Supreme Court and Second Circuit precedent, to prove attempted murder, the Government must prove that the defendant specifically intended to kill his attempted victim. See Braxton v. United States, 500 U.S. 344, 351 n.8 (1991) (holding that while murder can be committed without an intent to kill, "an attempt

---

[4] Mr. Hossain respectfully submits that a more accurate and reasonable assessment of his offense level is 28 under U.S.S.G. § 2M5.3(a) and (b)(1). With a criminal history category of I, his guidelines would be 78 to 97 months' imprisonment.

to commit murder requires a specific intent to kill"); United States v. Kwong, 15 F.3d 189, 194 (2d Cir. 1994) (requiring specific intent to kill to convict for attempted murder); United States v. Stroman, 420 F. App'x 100, 105 (2d Cir. 2011) (holding that for the attempted murder cross-reference under U.S.S.G. § 2A2.1(a)(2) to apply, the court must find that defendant acted with "specific intent" to kill his victim); United States v. Ward, No. 17 Cr. 171 (MPS), 2019 WL 6255198, at *3 (D. Conn. Nov. 22, 2019).

As courts in this District have repeatedly recognized in declining to apply the attempted murder cross-reference, "intent is obviously a difficult thing to prove," particularly when "it is heavily disputed." United States v. Diaz, 19 Cr. 65 (JMF), Dkt. No. 24, Tr. at 12 (Aug. 26, 2019). In this case, the Government did not have to—and indeed did not—prove that Mr. Hossain specifically intended to kill anyone in order to convict him of a violation of 18 U.S.C. § 2339A.

During the defense's Rule 29 argument and at the charge conference, defense counsel insisted that Mr. Hossain could not be convicted of violating 18 U.S.C. § 2339A by providing material support and resources "knowing or intending" they would be used to carry out or prepare for the killing of U.S. nationals abroad unless the Government proved beyond a reasonable doubt that Mr. Hossain had the specific intent to kill. The Court specifically rejected this argument and declined to impose such a burden on the Government. Instead, all the Government had to prove was that Mr. Hossain had "either knowledge or intent that the material support or resources would be used by another in preparation for or in carrying out the predicate crime." Trial Tr. at 932. The Court emphasized that the law did not require the Government to prove that "the predicate crime—i.e., the killing of U.S. nationals located abroad—have actually been committed, **or that the defendant had the specific intention to commit, or the intention to aid or encourage, the killing of U.S. nationals located abroad**." Id. (emphasis added). Because the Court instructed the jury that it did not need to determine Mr. Hossain possessed a specific intent to kill in order to convict him, it would be inapposite—and a violation of Mr. Hossain's Fifth Amendment due process rights and Sixth Amendment fair trial rights—to sentence him as if he actually had intended to kill someone.

This conclusion is reinforced by the parties' discussions about the Government's burden with respect to the requisite mens rea under 18 U.S.C. § 2339A. During the exchanges, the Court noted that there was "no specific intent needed by [Mr. Hossain] for him to kill U.S. soldiers." Trial Tr. at 863. During the charge conference, the Court further noted that an attempt to violate § 2339A did not require "specific intent to accomplish the killing of U.S. nationals abroad. Specific intent is that the defendant provided the support with knowledge it's to be used in carrying out the underlying offense…" Id. at 875. Against this backdrop, it would be inapposite and a miscarriage of justice to sentence Mr. Hossain as if his

13

conscious objective or purpose was to kill someone, and he took a substantial step in accomplishing his goal.

### B. Probation's reliance on the U.S. Guidelines' "official victim" and "terrorism" enhancements is misplaced.

In addition to the attempted murder "cross-reference," the Probation Department's calculation is further driven by two enhancements in the Guidelines. First, the Probation Department applies the "official victim enhancement" in U.S.S.G. §3A1.2(b) because the potential "victim was (A) government officer or employee." The Probation Department's calculation also applies U.S.S.G. 3A1.4(a)'s "terrorism enhancement." The "terrorism enhancement" is applied when the offense "involved, or was intended to promote, a federal crime of terrorism." A "federal crime of terrorism" is defined in 18 U.S.C. 2332b(g)(5) as relating to certain enumerated offenses "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Application of the "terrorism enhancement" increases the offense-level by 12 (the largest enhancement contemplated under the Guidelines) and propels the defendant into a Criminal History Category of VI regardless of prior criminal history.

Application of either provision results in extraordinarily long recommended prison sentences. Together, as evidenced here, the provisions can drive a defendant's Guidelines calculation irrationally off the sentencing chart. For the reasons that follow, both U.S.S.G. 3A1.2(b)'s and U.S.S.G. 3A1.4(a)'s enhancements are factually inapplicable and are otherwise inconsistent with basic due process and fair trial precepts.

#### 1. The "official victim" enhancement does not apply.

The official victim enhancement guideline only "applies when specified individuals are victims of the offense." U.S.S.G. 3A1.2 n. 1. "This guideline does not apply when the only victim is an organization, agency, or the government." Id. Based on the Government's allegations and proof at trial, Mr. Hossain only sought to provide support to the Taliban, and he did so with (at best) an amorphous desire to fight the United States Government. He did not intend to harm any specific person. Considering there was no named victim in this case—and not a single person was harmed in the execution of this criminal acts—this enhancement cannot, and should not, apply.

#### 2. The "terrorism" enhancement does not apply.

When U.S.S.G. § 3A1.4—the so-called "terrorism enhancement"—is invoked, it has a dramatic impact on sentences because it arbitrarily increases a defendant's

14

offense level and criminal history score, resulting in unthinkable sentencing ranges for first time offenders who did not actually hurt (or come close to hurting) anyone. This guideline represents bad anti-terrorism policy and does not serve the purposes of 18 U.S.C. § 3553(a). In particular, the terrorism enhancement treats all defendants convicted of a broad set of crimes the same, without accounting for their specific offense characteristics or their actual criminal history. Criminal conduct subject to the terrorism enhancement varies significantly, from attempting to provide support to a foreign terrorist organization to actually perpetrating a violent terrorist attack resulting in death or injury. But a person who attempts to provide camping gear and walkie talkies to the Taliban should not be punished the same as a person who kills someone (or many people) in a terrorist attack. Accordingly, the terrorism enhancement serves no legitimate purpose and the Court should decline to apply it.

The guideline automatically and uniformly increases a defendant's offense level, ensuring that he will be sentenced as if he was among the most serious offenses addressed by the Sentencing Guidelines, regardless of where the offense level fits on the spectrum of "material support." U.S.S.G. § 3A1.4(a). Additionally, the automatic shift to Criminal History Category Level VI—the most culpable level—ensures that a defendant will be sentences as if he was a career criminal (even if he, like Mr. Hossain, has no prior criminal record, including no prior arrests). Applying this guideline often causes a defendant to receive a greater increase in his sentence than a defendant who commits a more plainly violent offense.[5]

---

[5] Cf. U.S. Sentencing Comm'n, Analysis of the Violent Crime Control and Law Enforcement Act of 1994 (H.R. 3355, as Passed by the Senate November 19, 1993, and by the House April 26, 1994): Part II 13 (1994) (emphasizing the possibility of prison sentences for terrorism cases under-punishing defendants, but noting that the mandate to provide an enhancement for felonies promoting terrorism may present a problem "for the Commission [in] that it may be difficult to develop a single fixed guideline enhancement for terrorism that would appropriately account for the seriousness of the conduct in all cases… . While the terrorist goal may be serious in all cases, the specific crimes a defendant may commit in furtherance of terrorism may not always reflect that seriousness … . In addition, defendants who share a common terrorist objective may vary greatly in terms of the threat to persons and national security that they realistically pose"). U.S.S.G. section 3A1.4, however, takes a specific intent—the intent "to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"—and elevates that factor to dwarf all other factors. 18 U.S.C. § 2332b(g)(5)(a) (2006 & Supp. 2009) (providing intent requirement for a federal crime of terrorism); see also U.S. Sentencing Guidelines Manual § 3A1.4 cmt. n.1 (referring to 18 U.S.C. § 2332b(g)(5) for the definition of federal crimes of terrorism).

On the spectrum of offenses covered by the Guidelines—including offenses committed by strategic actors resulting in mass carnage—the Probation Department's calculation for Mr. Hossain's offense places him in a rare category reserved for the some of the worst offenders in the federal system. Mr. Hossain's conviction is serious, but it does not and should not elevate him to the highest level on the Guidelines' Sentencing Table.

The Government also cannot sustain its burden to trigger the Court's application of the terrorism enhancement. Support of a terrorist organization, even where that organization is the Taliban, does not automatically equate to a specific intent to influence, affect, or retaliate against a government. See, e.g., United States v. Alhaggagi, No. 19-10092, 2020 WL 6192982, at *7-9 (9th Cir. Oct. 22, 2020) (reversing district court's application of terrorism enhancement where defendant provided material support to a major terrorist organization); United States v. Stewart, 590 F.3d 93, 138-139 (2d Cir. 2009) (affirming district court's refusal to apply terrorism enhancement to translator convicted of lending material support to a terrorist conspiracy).

In order to sustain the terrorism enhancement, the Government must establish that the defendant had the specific intent to commit an offense that was "calculated" to impact or retaliate against government conduct. As explained by the Second Circuit, "'[c]alculation' is concerned with the object that the actor seeks to achieve through planning or contrivance." United States v. Awan, 607 F.3d 306, 317 (2d Cir. 2010). The appropriate focus is on the "'offense,' asking whether it was calculated, i.e., planned—for whatever reason or motive—to achieve the stated object." Id.

Here, the Government did not prove at trial that Mr. Hossain's conscious objective or purpose was to impact or retaliate against the United States. Taken in a light most favorable to the Government, perhaps one or two of Mr. Hossain's recorded communications with Suhail and Abu Bakr captured him talking about shooting U.S. soldiers. But these one-off comments were certainly not the focus of Mr. Hossain's alleged plan. Rather, as the Government contended in its closing arguments and remarks about the Court's jury instructions, Mr. Hossain's focus was to leave the United States, travel to Afghanistan, and join the Taliban, with the knowledge that his material support would be used to carry out the group's goals, including the killing of U.S. soldiers. This is not the "calculating" plan for retaliation or political message-sending that the terrorism enhancement is purportedly designed to cover.

### III. A Sentence of No More Than 72 Months' Imprisonment Is Sufficient But Not Greater Than Necessary to Achieve the Goals of Sentencing.

Mr. Hossain has no criminal history. He is a father of three young girls who, despite his shortcomings, love and adore him. Mr. Hossain also has a large and loving extended family—a group of people with whom Mr. Hossain has had a complex and tumultuous relationship, but who love him nonetheless. Mr. Hossain spent almost 16 months on bail without a single violation and endured hellish confinement conditions at the MCC New York and Essex County Correctional Facility. And his conviction appears inextricably intertwined with his mental health struggles, including bipolar disorder. He is not a violent person and has never been accused of committing act of violence. Sending him to prison for the next 25 years is a wholly disproportionate and gratuitous response to his conviction.

First, a sentence of no greater than 72 months is sufficient to comply with the purposes of punishment and deterrence. 18 U.S.C. § 3553(a)(2)(A), (B). With respect to deterrence, courts have recognized that prison has a greater significance and is therefore a greater punishment and deterrent, for those who have served little or no prison time in the past. See, e.g., United States v. Mishoe, 241 F.3d 214, 220 (2d Cir. 2001). In fact, research shows that a more severe sentence does not lead to greater specific deterrence for individual defendants. See The Honorable Peggy Fulton Hora & Theodore Stalcup, Drug Treatment Courts in the Twenty-First Century: The Evolution of the Revolution in Problem-Solving Courts, 42 Ga. L. Rev. 717, 724 (2008). The same can be said for general deterrence. See Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects…. Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."). To the contrary, evidence-based studies strongly support the conclusion that it is the certainty of being prosecuted rather than the severity of punishment that deters crime. See Five Things About Deterrence, Nat'l Inst. Of Just., (June 2, 2016), available at: https://nij.ojp.gov/library/publications/five-things-about-deterrence. The fact that Mr. Hossain was prosecuted, jailed, and punished will provide sufficient general deterrence; a lengthy additional term of incarceration is greater than necessary.

Second, Mr. Hossain, who has never previously been incarcerated or involved with the criminal justice system at all, will have spent nearly 17 months in custody by the time of his sentencing. And, as noted above, they have been an especially challenging 17 months, marked by severe lockdowns and a prolonged separation from his counsel and loved ones. Courts in this district routinely take harsh conditions of confinement into account under § 3553(a). See, e.g., United States v. Ozols, 16 Cr. 692 (JMF) (giving defendant credit at sentencing for what he endured

17

at the MDC during an eight-day blackout); United States v. Serrano, 18 Cr. 393 (LAK) (same).

Since the COVID-19 pandemic, judges within this district have considered the impact of the virus as a §3553(a) factor and granted downward variances based on the conditions endured by inmates at BOP facilities. See, e.g., United States v. Morgan, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), ECF No. 90 (cutting the sentence to less than half of the low end of the guidelines based in part on conditions at MDC during the pandemic and condemning the conditions at MCC and MDC prior to the current crisis); United States v. Casillas, 19 Cr. 863 (VSB) (S.D.N.Y. May 4, 2020), ECF No. 27 (reducing the length of the sentence in part based on conditions at MCC during the COVID-19 crisis); United States v. Pierson, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020), ECF No. 73 (same for defendant detained at MDC).

In the sentencing of Tiffany Days, 19 Cr. 619 (CM), held on April 29, 2021, former Chief Judge McMahon made the following comments about the MCC: "It is the finding of this Court that the conditions to which she was subjected are as disgusting, inhuman as anything I've heard about in any Colombian prison, but more so because we are supposed to be better than that." (ECF No. 35, at p. 19.) Similarly, Judge Engelmayer's thoughtful comments during the imposition of sentence in United States v. Aracena De Jesus, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020), ECF No. 27 at 36-37, speak volumes about the harsh conditions of detention at the MCC and its impact on detainees:

> "Finally, I am mindful … that you have served most of your time in prison so far during the worst pandemic in this country during the past 100 years…. I'm mindful that your experience in prison as a result of the pandemic, the preceding lockdown, the ensuing lockdown … was frightful. Prison is supposed to be punishment, but it is not supposed to be trauma of that nature or close. My colleagues and I commonly informally credit prisoners who have served time awaiting extradition in dreadful prisons overseas with more time served than measured by the calendar. The same logic applies here, and then some….
>
> Bottom line, your time in the MCC was way harder than anyone intended when you were detained following your arrest. Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you experienced since your arrest in December."

See also, e.g., United States v. Jervis Cerino, 19 Cr. 323 (JSR) (S.D.N.Y. July 21, 2020) (granting a variance from a Guidelines range of 57 to 71 months for a Hobbs Act robbery and imposing a sentence of 10 months, noting: "[I]t is fair to say that

18

conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons"). The same logic applies to Mr. Hossain and militates against locking him up for hundreds of months.

Third, Mr. Hossain is unlikely to receive the kind of focused, compassionate, and consistent mental health treatment that he requires while in BOP custody. 18 U.S.C. § 3553(a)(2)(D). As set forth in Dr. Fernandez's report, Mr. Hossain's ongoing struggles with bipolar disorder, which are plainly relevant to the circumstances of his conviction, require immediate and intensive intervention and medication. Unfortunately, the BOP's health service units are grossly understaffed and are not well-positioned to help Mr. Hossain. See, e.g., Dep't of Justice Federal Prison System Fiscal Year 2019 Performance Budget, at p. 7 (projecting BOP to operate at 16% over its rated capacity). For example, in March 2016, the Department of Justice's Office of the Inspector General released a comprehensive review of BOP's "medical staffing challenges," describing the situation in at least some facilities as a "crisis." See Review of the Federal Bureau of Prisons' Medical Staffing Challenges, (Mar. 2016).[6] And within these severely overcrowded, understaffed prisons, roughly 44% of male inmates suffer from mental health problems. See DOJ, Bureau of Justice Statistics, Mental Health Problems of Prison and Jail Inmates, p. 4, Table 3 (Sept. 2006).[7] And yet, a very small percentage of these individuals ever receive professional mental health treatment. See id., p. 3 (Table 1) & p. 9 (Table 14). See also, e.g., Christie Thompson and Taylor Elizabeth Eldridge, Treatment Denied: The Mental Health Crisis in Federal Prisons, The Marshall Project (Nov. 21, 2018, 6:00 a.m. ET).[8] The Court cannot be assured that Mr. Hossain will have access to the medication and counseling he needs while in BOP custody, but it can take steps to ensure the same while Mr. Hossain is on supervised release.

IV.    Conclusion.

Throwing the book at Mr. Hossain because of the type of crime he was convicted of is not justice and it is otherwise incompatible with the directives of 18 U.S.C. § 3553(a). Rather, the Court must look to the particular circumstances of

---

[6] Available at https://oig.justice.gov/reports/2016/e1602.pdf
[7] Available at: https://www.bjs.gov/content/pub/pdf/mhppji.pdf
[8] Available at: https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons

19

Mr. Hossain's offense, weigh them against his background, character, and record, and assess what length of time is sufficient, but not greater than necessary, to adequately punish him, provide deterrence, and afford him access to medical treatment in the most effective manner. Taking all of these considerations into account, a sentence of no greater than 72 months' imprisonment is appropriate.

                                        Respectfully Submitted,

                                        Andrew J. Dalack, Esq.
                                        Amy Gallicchio, Esq.

Cc:    Government Counsel                  Assistant Federal Defenders

                                        Counsel for Delowar Hossain