UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

DELOWAR MOHAMMED HOSSAIN,

Defendant.

S1 19 Cr. 606 (SHS)

**THE GOVERNMENT'S SENTENCING MEMORANDUM**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Benjamin Woodside Schrier
Assistant United States Attorney
    *Of Counsel*

## **CONTENTS**

BACKGROUND ..................................................................................................................... 2

I.    Offense Conduct ......................................................................................................... 2

    A.    Hossain Consumes al Qaeda Propaganda and Plans to Attack a U.S. Military Recruiting Station in the Bronx ................................................................................................. 2

    B.    Hossain Researches the Taliban and Plans to Travel to Afghanistan, Join the Taliban, and Fight in Their Jihad ......................................................................................... 4

    C.    Hossain Recruits At Least Six Other Individuals to Travel to Afghanistan, Join the Taliban, and Fight in Their Jihad .................................................................................. 7

    D.    Hossain Saves $10,000 in Cash to Buy Weapons to Use While Fighting in the Taliban's Jihad and to Survive in Afghanistan ........................................................................ 11

    E.    Hossain Buys Mountain Survival Gear and Other Supplies to Use in Afghanistan While Fighting in the Taliban's Jihad ....................................................................................... 13

    F.    Hossain Contacts Former Taliban Fighter and Current Taliban Supporter Zaid Hamid in Pakistan to Get Connected with the Taliban in Afghanistan ................................................ 14

    G.    Hossain Takes Steps to Evade Detection by Law Enforcement, Including Buying a Plane Ticket to Thailand ........................................................................................................ 15

    H.    Hossain Travels to JFK Airport, Attempts to Board His Flight to Thailand, and Is Arrested ....................................................................................................................... 21

II.    Procedural History .................................................................................................... 22

DISCUSSION ..................................................................................................................... 24

I.    Applicable Law ......................................................................................................... 24

II.    Probation Correctly Calculated the Guidelines Range as 420 Months' Imprisonment .... 24

    A.    Probation Correctly Calculated the Base Offense Level as 33 ..................................... 25

    B.    Probation Correctly Applied the Six-Level Official-Victim Enhancement................. 28

    C.    Probation Correctly Applied the 12-Level Terrorism Enhancement........................... 30

III.    The Sentencing Factors Call for a Guidelines Sentence ............................................. 36

    A.    The Seriousness of the Offenses, Promoting Respect for the Law, and Providing Just Punishment for the Offenses Warrant a Guidelines Sentence ............................................. 36

    B.    Affording Adequate Deterrence to Criminal Conduct and Protecting the Public from Further Crimes of Hossain Warrant a Guidelines Sentence ................................................... 43

    C.    A Guidelines Sentence Would Not Result in Unwarranted Sentencing Disparities..... 46

    D.    Defense Counsel's Remaining Arguments Do Not Establish Mitigation.................... 50

CONCLUSION..................................................................................................................... 53

## AUTHORITIES

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ............................................................... 24
*U.S. v. Mohammed*, No. 06 Cr. 357 (CKK) (D.D.C.) ................................................. 36
*United States v. Alaa Sadeh*, 15 Cr. 558 (D.N.J.) .................................................... 47
*United States v. Alimehmeti*, 16 Cr. 398 (S.D.N.Y. 2017).................................... 36, 46
*United States v. Awan*, 607 F.3d 306 (2d Cir. 2010) ...................................... 31, 32, 35
*United States v. Babafemi*, 2021 WL 1210313 (E.D.N.Y. Mar. 31, 2021) ................ 43
*United States v. Ceasar*, 10 F.4th 66 (2d Cir. 2021) ....................................... 31, 48, 49
*United States v. Clark*, No. 20 Cr. 76 (NRB) (S.D.N.Y.)......................................... 47
*United States v. Cromitie*, 2011 WL 2693293 (S.D.N.Y. 2011) ........................... 28, 29
*United States v. El Bahnasawy*, 16 Cr. 376 (S.D.N.Y. 2016)................................... 36
*United States v. Farhane, et al.*, No. 05 Cr. 673 (LAP) (S.D.N.Y.).................... 46, 47
*United States v. Kaziu*, No. 09 Cr. 660 (JG) (E.D.N.Y.) ........................................ 35
*United States v. Kourani*, 6 F. 4th 345 (2d Cir. 2021) ............................................ 47
*United States v. Meskini*, 319 F.3d 88 (2d Cir. 2003)........................................ 31, 44
*United States v. Mumuni*, 946 F.3d 97 (2d Cir. 2019) ...................... 30, 44, 49, 52
*United States v. Naji*, No. 16 Cr. 653 (FB) (E.D.N.Y.) ........................................... 49
*United States v. Polk*, 118 F.3d 286 (5th Cir. 1997 .............................................. 29
*United States v. Pugh*, 15 Cr. 116 (NGG) (E.D.N.Y.)............................................ 47
*United States v. Rahimi*, 16 Cr. 760 (S.D.N.Y. 2017) ............................................ 36
*United States v. Raishani*, No. 17 Cr. 421 (RA) (S.D.N.Y.) ..................... 39, 40, 46, 47
*United States v. Saidakhmetov*, 2018 WL 461516 (WFK) (E.D.N.Y.) ..................... 49
*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) .................................. 31, 44, 49
*United States v. Zea*, 13 Cr. 72 (SJF) (E.D.N.Y.) .................................................. 47

**Statutes**

18 U.S.C. § 1512 ..................................................................................................... 48
18 U.S.C. § 1542 ..................................................................................................... 46
18 U.S.C. § 2332 ............................................................................................... passim
18 U.S.C. § 2339 ............................................................................................... passim
18 U.S.C. § 3553 ............................................................................................... passim
18 U.S.C. § 371 ....................................................................................................... 46
21 U.S.C. § 960 ....................................................................................................... 36
31 C.F.R § 594.310 ................................................................................................. 22
31 C.F.R. § 595.204 ................................................................................................ 22
31 C.F.R. § 595.205 ................................................................................................ 22
50 U.S.C. § 1705 ..................................................................................................... 22

**Other Authorities**

International Emergency Economic Powers Act ........................................................ 48
United States Sentencing Guidelines ................................................................. passim
Violent Crime Control and Law Enforcement Act of 1994....................................... 30

The Government respectfully submits this memorandum in advance of the sentencing hearing of Delowar Mohammed Hossain ("Hossain" or the "defendant"), which is currently scheduled to take place on March 17, 2022.  As explained below, the Court should sentence the defendant to 420 months' imprisonment, which is the sentence recommended by the U.S. Sentencing Guidelines (the "Guidelines" or "U.S.S.G").

Hossain is a dangerous, radicalized extremist who devoted himself to killing Americans. He initially planned to use machineguns to attack a military recruiting station in the Bronx. Worried that the attack would not kill enough people, he shifted his focus to traveling to Afghanistan and joining the Taliban, an extremist organization that had killed thousands of Americans and would kill many more.  Over the next 10 months, Hossain meticulously planned his journey to jihad.  He researched the Taliban and consumed its propaganda; recruited at least six other individuals to travel with him; saved $10,000 in cash to buy weapons; stockpiled mountain survival gear; contacted a former Taliban fighter in Pakistan; and took numerous steps to evade detection by law enforcement.  Among those Hossain brought into his circle was a confidential source working with the FBI, which enabled the FBI to gain access to Hossain and ultimately thwart his murderous plot.

The sentence of no more than 72 months that defense counsel request would not come close to reflecting the extremely serious nature of the defendant's offenses; providing just punishment for his conduct; deterring and preventing him from resuming his activities in support of radical Islamic terrorist ideology; and deterring others in the United States from seeking to join dangerous extremist groups like the Taliban.  Instead, all the relevant sentencing factors militate strongly in favor of a significant incarceratory sentence.  Such a sentence is warranted to account for Hossain's egregious attempt to take up arms against his country and kill his fellow citizens.

## BACKGROUND

I. **Offense Conduct**
  A. **Hossain Consumes al Qaeda Propaganda and Plans to Attack a U.S. Military Recruiting Station in the Bronx**

In or about March 2018, at a mosque in the Bronx ("Mosque-1"), the defendant approached a confidential source ("CS-1") working with the FBI and struck up a conversation with him. *See* Trial Tr. ("Tr.") 160–61. CS-1 was at Mosque-1 for reasons unrelated to the defendant and knew nothing about him before they met. *See* Tr. 161. During their conversation at Mosque-1, the defendant suggested that he and CS-1 pray at a different mosque ("Mosque-2") in the Bronx, because the majority of worshippers at Mosque-1 were Shia Muslims, while the defendant and CS-1 were Sunni Muslims. *See* Tr. 161. Toward the end of the conversation, the defendant and CS-1 exchanged phone numbers. *See* Tr. 162.

In or about April 2018, the defendant contacted CS-1, sent him the address of Mosque-2, and arranged to meet him there. *See* Tr. 163–68; GX 545 (April 2018 text messages between defendant and CS-1 regarding Mosque-2), 705 (photograph of Mosque-2). That same day, the defendant and CS-1 met at the defendant's vehicle, which was parked near Mosque-2; entered Mosque-2 and prayed; and exited Mosque-2 and entered the vehicle. *See* Tr. 168. Inside the vehicle, the defendant told CS-1 that he liked to listen to recordings of Anwar al-Awlaki, the now-deceased former key organizer and spokesman for al Qaeda who has inspired radical Islamic terrorists around the world, and asked CS-1 what he thought about al-Awlaki. *See* Tr. 168. Toward the end of the conversation, the defendant stated that one day, God willing ("In sha'Allah"), there would be jihad. *See* Tr. 168. Approximately two weeks later, the defendant and CS-1 met at Mosque-2 and prayed there for a second time. *See* Tr. 170–71.

2

Between in or about April 2018, when the defendant and CS-1 met at Mosque-2 for the first time, and September 11, 2018, when CS-1 next saw the defendant in person, the defendant and CS-1 occasionally communicated by phone. *See* Tr. 173, 828–33; GX 910–11 (records and records key related to defendant's phone number), 712 (summary chart reflecting communications between defendant and CS-1).

On September 11, 2018, without advance notice, the defendant arrived at CS-1's store in the Bronx. *See* Tr. 174. The defendant told CS-1 that the defendant wanted to speak with CS-1, and asked CS-1 to leave the store and enter the defendant's vehicle, which was parked outside. *See* Tr. 174. The defendant and CS-1 left the store and entered the vehicle. *See* Tr. 174. Inside the vehicle, the defendant stated that he was ready for jihad, and that he and CS-1 could attack a U.S. military recruiting station on Fordham Road in the Bronx. *See* Tr. 175, 191; GX 1014 (video surveillance footage from store depicting foregoing events).[1] After the conversation in the defendant's vehicle, the defendant left the store, and CS-1 contacted the FBI and reported what the defendant had stated. *See* Tr. 175–76. The FBI instructed CS-1 to invite the defendant to visit his store again and gave CS-1 a recording device to record any conversation that he had with the defendant when he returned. *See* Tr. 179-80.

On September 21, 2018, at CS-1's invitation, the defendant returned to the store, and the defendant and CS-1 had another conversation in the defendant's vehicle while it was parked outside. *See* Tr. 179-81. CS-1 recorded that conversation with the device that the FBI had given

---

[1] There is a U.S. military recruiting station located near the intersection of Fordham Road and Grand Concourse in the Bronx.

him.  *See* Tr. 181.  During the conversation, the defendant told CS-1 to turn off his phones to prevent law enforcement from listening in.  *See* Tr. 187; GX 201, 201-T.  The defendant also stated that he had listened to all of al-Awlaki's lectures.  *See* Tr. 197–98; GX 201, 201-T.  Additionally, the defendant discussed his attempts to buy AK-47 assault rifles for $700 each; his plans to use the rifles in an attack on the recruiting station; and his expectation that, in such an attack, everyone inside the recruiting station would be killed.  *See* Tr. 190–94; GX 201, 201-T, 202, 202-T.  The defendant further stated that the attack on the recruiting station would be legitimate because of the war against the U.S. government.  *See* GX 201, 201-T.  During a later recorded conversation, the defendant told CS-1 that he had learned how to make bombs with "gun powder" and "nails" from an al Qaeda "make-your-own-bomb or make-your-own jihad type of magazine" that he had read online, and that he was worried that his having accessed the magazine would allow the FBI to trace him.  *See* GX 207, 207-T.

### B.  Hossain Researches the Taliban and Plans to Travel to Afghanistan, Join the Taliban, and Fight in Their Jihad

During the same September 21, 2018 recorded conversation, the defendant also discussed traveling to Afghanistan, joining the Taliban, and fighting in their jihad against U.S. and coalition forces instead of attacking the recruiting station.  The defendant stated, "What I was thinking . . . is moving.  Moving to Pakistan.  From there, finding the Taliban.  And then joining them.  Because the Taliban, I've been doing a lot of research on them.  They . . . have a legitimate jihad, which is without any doubt by the will of Allah, we will not be faltered."  GX 201, 201-T.

The defendant described several reasons why he was planning to join the Taliban, including his concerns that, to successfully attack the recruiting station, he would need more ammunition,

4

and more and better-trained people to join the attack; that the attack would kill only one or two people, which was not enough; that he would be arrested and imprisoned for the attack; that law enforcement would retaliate against his family for the attack; that he had not sworn an oath of allegiance ("bay'ah") to a leader ("emir") who would lead the attack, as required by the fundamentalist interpretation of Sunni Islam to which the defendant subscribes; and that, generally speaking, joining the Taliban and fighting in their jihad more closely accorded with his fundamentalist beliefs. *See* Tr. 191–98; GX 201, 201-T, 202, 202-T, 203, 203-T, 204, 204-T.  The defendant was worried that, if he died in the attack on the recruiting station, there would be no guarantee that he would become a martyr ("shahid") and go to heaven ("Jannah"); but if he died fighting with the Taliban in their jihad, his martyrdom would be assured.  *See* GX 201, 201-T. This was particularly true in the defendant's view because, while fighting with the Taliban in their jihad, the defendant would have an emir to follow: a Taliban commander to whom he would give bay'ah.  *See* Tr. 195–96, 536–37, 682; GX 203, 203-T, 336, 336-T.

As early as that first recorded conversation, the defendant was already discussing the specifics of his plot to travel to Afghanistan, join the Taliban, and fight in their jihad.  The defendant explained that, if he tried to buy a plane ticket for a direct flight to Afghanistan, he might be stopped by law enforcement; so instead, he planned to buy a ticket for a flight to Pakistan, and then travel overland across the border from Pakistan into Afghanistan.  *See* GX 201, 201-T.  The defendant also stated that it would be "very easy" to find people in Pakistan who could connect him with the Taliban.  *See* GX 203, 203-T.  Indeed, the defendant had already identified a mosque in Pakistan that supported the Taliban; the leader ("imam") of the mosque encouraged individuals to fight in the Taliban's jihad.  *See* GX 203, 203-T.  The defendant had watched videos about the

mosque on YouTube.  *See* GX 203, 203-T.  The defendant stated, "[I]f we go to Pakistan, all we have to do is find that mosque" to get connected with the Taliban.  *See* GX 203, 203-T.

During the same conversation, the defendant stated that he had started going to the gym every other day to train his body for jihad.  *See* GX 202, 202-T.  He also discussed recruiting other individuals to attack the recruiting station, as well as recruiting other individuals to travel to Afghanistan, join the Taliban, and fight in their jihad.  *See* GX 204, 204-T.  The defendant was explicit when answering CS-1's questions about whom he and the Taliban would be fighting:

CS-1:             And if you go over there who are you going to fight?

DEFENDANT:    You fight the American government, from there, . . . combined
                with the Taliban . . . .

CS-1:             Why is the, the U.S. government is there too?

DEFENDANT:    Yes!  You've got U.S. government . . .

CS-1:             You got the army there, you got . . .

DEFENDANT:    The U.S. government, army, is over there in . . . Afghanistan.
                So we're going to Pakistan, and then we're going to Afghanistan
                from Pakistan.

CS-1:             And we can fight them?

DEFENDANT:    We fight them over there.  Because then we'll be with the
                mujahideen [jihadist guerilla fighters], so we have an emir, we
                have the social structure, we have everything.

GX 203, 203-T.

On October 24, 2018, approximately one month later, the defendant met with CS-1 again, and CS-1 again recorded the conversation.  *See* Tr. 198–201; GX 205, 205-T, 207, 207-T.  During the conversation, the defendant discussed how he planned to evade detection by law enforcement

on his way to Afghanistan to join the Taliban and fight in their jihad, and how he planned to get connected with the Taliban through individuals in Pakistan.  *See* Tr. 199–201; GX 205, 205-T. For example, the defendant explained that he would buy a round-trip plane ticket, instead of a one-way ticket, even though he was not planning to return, because a one-way ticket would look suspicious.  *See* GX 205, 205-T.  The defendant also stated that he had seen a video on YouTube of a leader ("sheikh") in Pakistan who supported jihad, and that he could go to Pakistan and find the sheikh.  *See* Tr. 200; GX 205, 205-T.  Additionally, the defendant discussed waiting to travel to Afghanistan until at least May 2018, when James Bradley, a/k/a "Abdullah," one of his co-conspirators, would turn 18, because traveling with Bradley before he was 18 would increase the risk that they would be stopped.  *See* GX 205, 205-T, 212, 212-T.

### C. Hossain Recruits At Least Six Other Individuals to Travel to Afghanistan, Join the Taliban, and Fight in Their Jihad

As described above, during the defendant's October 24, 2018 conversation with CS-1, the defendant discussed Bradley, one of his co-conspirators, who planned to travel to Afghanistan, join the Taliban, and fight in their jihad with him.  *See* GX 205, 205-T, 212, 212-T.  Bradley was young, zealous, and strict in his adherence to radical Islam; trained in martial arts; and had converted to Islam from Catholicism, after which he took the Muslim name "Abdullah."  *See* Tr. 204, 608–09; GX 205, 205-T, 220, 220-T.  The defendant had met Bradley before the defendant met CS-1.  *See* Tr. 204, 609.  In or about October 2018, the defendant introduced CS-1 to Bradley. *See* Tr. 209; GX 211, 211-T.  After CS-1 introduced the defendant to another confidential source ("CS-2") (collectively with CS-1, the "CSes") working with the FBI in or about November 2018,

*see* Tr. 251–55, 590–91; GX 225, 225-T, the defendant also introduced CS-2 to Bradley, *see* Tr. 255, 607–08.

The defendant, Bradley, and the CSes thereafter began frequently meeting in person and communicating through WhatsApp group message threads to discuss the details of the defendant's plot to travel to Afghanistan, join the Taliban, and fight in their jihad, and to exchange Taliban propaganda and other materials related to the Taliban and jihad.  *See* Tr. 255–60, 590–619; GX 230, 230-T, 532–44 (screenshots from "Brothers" WhatsApp group message thread including defendant, Bradley, and CSes), 526–31 (screenshots from "5 brothers one camel" WhatsApp group message thread including defendant, Bradley, and CSes), 1015 (February 22, 2019 video surveillance footage of defendant and Bradley together on street in Bronx).

During the in-person meetings, the defendant, Bradley, and the CSes discussed various aspects of the defendant's plot.  For example, just as he had done during the first recorded conversation with CS-1, the defendant often underscored the importance of training their bodies for jihad.  *See* GX 230, 230-T, 280, 280-T.  Bradley also shared information regarding which provinces of Afghanistan the Taliban controlled; multiple overland routes that they could potentially take into Afghanistan, including from Pakistan and Tajikistan; and another foreign terrorist organization operating in Afghanistan that Bradley believed worked with the Taliban.  *See* GX 238, 238-T.  In the WhatsApp group message threads, the defendant and Bradley circulated links to various types of materials concerning the Taliban and jihad, including the following:

- a link to the Wikipedia page for the Darul Uloom Haqqania, an Islamic seminary in northwestern Pakistan where a number of leading members of the Taliban studied, which

has been dubbed the "University of Jihad" due to its methods and content of instruction and the future activities of its alumni, *see* Tr. 835–36; GX 538;

- a YouTube video titled "Jihad Verses from the Quran," *see* Tr. 837–38; GX 540;

- a YouTube video titled "Can A Muslim Be Punished In The Grave Imam Anwar Al Awlaki," *see* Tr. 838–39; GX 531;

- a YouTube video titled "Taliban talks: Chilling face-to-face interview with terror commander Qari Nasrullah," *see* Tr. 840–42; GX 538, 1005 (screenshot of video), 1006 (clip from video); and

- a YouTube video titled "Behind The Taliban Mask: The Other Side of Afghanistan's Front-line," *see* Tr. 843–46; GX 538, 1011 (screenshot from video), 1001–02 (clips from video), 1004 (clip from video). The "Behind The Taliban Mask" YouTube video depicts members of the Taliban carrying assault rifles; using the rifles, rocket launchers, and other heavy weaponry to attack U.S. and coalition forces in Afghanistan; and discussing the many U.S. servicemembers whom the Taliban had killed, *see* GX 1001–02, 1004.

In addition to exchanging these materials, the defendant also discussed in person with Bradley and the CSes his plot to kill U.S. servicemembers with the Taliban in Afghanistan. *See* Tr. 169, 194, 199, 273, 295, 351–52, 589, 592; GX 307, 307-T. For example, during a February 8, 2019 recorded conversation with CS-1, the defendant discussed using AK-47s and pistols to fight with the Taliban in their jihad, and the Taliban's use of rocket launchers against U.S. and coalition forces in Afghanistan:

> Each of us, we'll probably . . . get AK-47, one pistol. Small ones to carry on the side, and have an AK-47. If you run out of ammo you take this one and boom boom boom. Ha Ha! War, baby. . . . You can kill more people like that. . . . Right now,

9

with the modern warfare?  Eh, what the Taliban do, they stand on top of a mountain, right?  And they see the cars pass by. . . .  They . . . shoot it with a rocket launcher at the car and just kill everybody in the car.  One rocket, that's it.  Everybody dead.  So they don't even know where it came from. . . .  Yeah, that's why they [the United States] can't win because they go—the Taliban stay all the way in the mountain, you can't see where they are.  They just shoot them, then boom, done.  It's called guerilla warfare.  This is why they can't win against us [the Taliban].  Even though you have all these weapon, all of this—what are you gonna do with the weapon when you don't know where your enemy is. . . .  They're always hiding somewhere.  They dig holes underneath the grass. . . .  They hide underneath the thing.  Like, inside, ah—like underground, they make holes and they're still living in there.  And then when the time comes, they go "pip," that's it, done.  And then it's like, "What the—what happened?  We have millions of dollars of weapons and we can't do nothing to these guys.  We don't know where they are." . . . .  Because they're not afraid to die, you know?  They don't mind.  They don't care.  They don't care.  They don't care.

GX 251, 251-T; *see also* Tr. 295.  Additionally, during an April 4, 2019 recorded conversation with CS-1, the defendant stated that he wanted "to kill some kufar before [he] die[d]."  GX 309, 309-T.  The word "kufar" means infidel or non-believer; when the defendant used the term, he was referring to Americans.  *See, e.g.*, Tr. 272–73, 294–95, 481, 536, 602, 647, 650–51.

Eventually, after the defendant had been discussing for months the details of his plot to travel to Afghanistan, join the Taliban, and fight in their jihad with Bradley and the CSes, the defendant arranged for them to give bay'ah to him and make him their emir.  *See* Tr. 195, 290, 476–77, 622, 679, 682.  As CS-1 testified at trial, the defendant "nominated himself," Tr. 477; the defendant "asked that he be in charge of [them], and [they gave] him that," Tr. 195.

Bradley and the CSes were not the only individuals whom the defendant recruited.  For instance, the defendant recruited an individual who used the Muslim name Abdul Jalil.  *See* Tr. 209–12, 607.  The defendant introduced Abdul Jalil to CS-1.  *See* Tr. 209–12; GX 1016 (FaceTime video between defendant and CS-1 depicting defendant, Bradley, and Abdul Jalil at restaurant).

10

Through the defendant's introduction, Abdul Jalil participated in the "5 brothers one camel" WhatsApp group message thread, in which he was the fifth "brother." *See* Tr. 607; GX 526–31.

Additionally, the defendant recruited another individual to support him financially in traveling to Afghanistan, joining the Taliban, and fighting in their jihad, but the individual stopped communicating with the defendant when the individual lost his faith in Islam. *See* Tr. 212–13; GX 206, 206-T. The defendant also recruited a different individual whom he was trying to get to know because the individual had connections to many other individuals in Afghanistan; the defendant was interested in using the individual to get connected with the Taliban. *See* Tr. 213–14; GX 215, 215-T.

More generally, the defendant discussed trying to recruit other individuals as part of his Da'wah (inviting or calling individuals to embrace Islam) for jihad. *See* Tr. 215–16; GX 269, 269-T. In total, the defendant attempted to recruit at least six individuals, including the CSes. The defendant explained, "I'm the one who went around, taking, gathering you guys together." *See* Tr. 217; GX 276, 276-T.

### D. Hossain Saves $10,000 in Cash to Buy Weapons to Use While Fighting in the Taliban's Jihad and to Survive in Afghanistan

Between September 21, 2018, when CS-1 first recorded a conversation with the defendant, and July 26, 2019, when the defendant was arrested at John F. Kennedy International Airport ("JFK Airport"), the defendant repeatedly stressed how important it was that he, Bradley, and the CSes each save $10,000 in cash, the maximum amount that they could each legally take out of the United States when leaving for Afghanistan to join the Taliban. *See* Tr. 264–67; GX 209, 209-T, 217, 217-T, 222, 222-T.

When discussing the importance of saving $10,000 in cash, the defendant stated to CS-1, "Because when you go over there [Afghanistan], Akhi [brother], you're gonna need money to buy weapons too. . . . Because nobody's gonna give you free weapons."  GX 222, 222-T.  The defendant further explained that he, Bradley, and the CSes also needed to save $10,000 each so that they had enough money to "at least survive a year . . . on [their] own" as they made their way to Afghanistan to join the Taliban.  GX 209, 209-T.  As CS-1 testified, the defendant "said that we needed a lot of money so when we get there [Pakistan, and eventually, Afghanistan], we can buy some weapons, until such time when we join the bigger organization [the Taliban], and staying there [Afghanistan] will require some money anyway."  Tr. 264–65.  In the WhatsApp group message threads, Bradley sent the defendant and the CSes a link to a YouTube video titled "The Gun Shops of Kabul."  *See* GX 534.

Between January 5, 2019 (less than four months after the first recorded conversation with CS-1), and July 3, 2019 (approximately three weeks before his arrest), the defendant made 39 cash withdrawals from his JPMorgan Chase Bank account.  *See* Tr. 823–26; GX 908 (records related to bank account), 702 (summary chart reflecting cash withdrawals from bank account).  The total amount of cash that the defendant withdrew from his bank account during this time period was approximately $10,002.25.  *See* Tr. 823–26; GX 908, 702.  Additionally, as discussed in greater detail below, when the defendant was arrested at JFK Airport, law enforcement found $10,100 in cash on his person during a search incident to his arrest.  *See* Tr. 117–18; GX 140 (photograph of $10,100 in cash seized during search incident to defendant's arrest).

### E.  Hossain Buys Mountain Survival Gear and Other Supplies to Use in Afghanistan While Fighting in the Taliban's Jihad

On or about January 24, 2019, at the defendant's direction, the defendant, Bradley, and the CSes traveled to a Best Buy store in Queens, where they bought several two-way radios that each had a range of 38 miles. *See* Tr. 283–89, 619–21; GX 1013 (video surveillance footage from Best Buy depicting group buying the radios), 401 (photograph of gift card used to buy the radios), 402 (photograph of receipt from Best Buy reflecting purchase of the radios).  The defendant and the CSes also traveled to a mall and bought cold-weather clothing, including jackets and gloves, to wear during the freezing Afghan winter while fighting in the Taliban's jihad against U.S. and coalition forces. *See* Tr. 630–31; GX 279, 279-T.

Additionally, in or about May 2019, the defendant began ordering supplies from Amazon for himself, Bradley, and the CSes to use in Afghanistan while fighting in the Taliban's jihad. *See* Tr. 278–83, 317–29, 610–11, 618, 630–36; GX 280, 280-T, 299, 299-T, 322, 322-T, 141 (photographs of supplies), 503 (screenshots from "Vacation talk" WhatsApp group message thread including defendant and CSes), 902 (Amazon records reflecting defendant's purchase of supplies). The defendant ordered the supplies using an Amazon account that he had created for that purpose, and had the supplies delivered to CS-1's store instead of his own residence in the Bronx to avoid arousing his wife's suspicion. *See* Tr. 279, 317–29, 631–32; GX 141, 503, 902.   As depicted in part below, the supplies included a machete; an ax; a knife; a serrated ring saw; a four-person tent; sleeping bags rated for freezing conditions; emergency thermal blankets; solar power panels; personal water filters; a fire starter; a 12-volt car jump starter; and many other similar items:



GX 141; *see also* Tr. 278–83, 317–29, 630–36; GX 280, 280-T, 299, 299-T, 322, 322-T, 503, 902.

The defendant, Bradley, and the CSes also discussed the supplies in the WhatsApp group message

threads. *See* Tr. 610–11, 618; GX 503.

### F. Hossain Contacts Former Taliban Fighter and Current Taliban Supporter Zaid Hamid in Pakistan to Get Connected with the Taliban in Afghanistan

On February 3, 2019, the defendant met with CS-1, and CS-1 recorded the conversation.

*See* Tr. 201–02; GX 246, 246-T, 250, 250-T.  During the conversation, the defendant used his

14

phone or iPad to play for CS-1 a video of an interview of an individual named Zaid Hamid.  *See* GX 250, 250-T.  The defendant explained that Hamid was a member of the Pakistani military who previously fought with the Taliban for six years and still had connections with the Taliban.  *See* GX 250, 250-T.  The defendant sent a Facebook message to Hamid in an effort to get connected with the Taliban but Hamid did not respond.  *See* Tr. 201–02; GX 246, 246-T.  Even though Hamid did not respond, the defendant remained confident that he would be able to find Hamid in Pakistan, because Hamid moved around without security.  *See* GX 246, 246-T.

In the WhatsApp group message threads, the defendant later sent Bradley and the CSes a link to a YouTube video titled "Zaid Hamid: Intense, philosophical, ideological & spiritual discussion with a group of students."  *See* Tr. 646–47; GX 531.[2]

### G.  Hossain Takes Steps to Evade Detection by Law Enforcement, Including Buying a Plane Ticket to Thailand

Between September 21, 2018, when CS-1 first recorded a conversation with the defendant, and July 26, 2019, when the defendant was arrested, the defendant frequently took steps to evade detection by law enforcement and instructed Bradley and the CSes to do the same.  As described above, during their first recorded conversation, the defendant told CS-1 to turn off his phones to prevent law enforcement from listening in.  *See* Tr. 187, 260–61; GX 201, 201-T.  Throughout the course of the defendant's plotting, he consistently emphasized the importance of turning off

---

[2] On October 7, 2021, during jury deliberations, the jury sent the Court a note requesting all evidence that the Government had introduced at trial regarding Hamid, which the Court provided to the jury.  *See* Tr. 1042–51.  This note was the only note that the jury sent the Court during its deliberations.

phones, discussing the plot in person instead of on the phone, and avoiding electronics so that law enforcement could not track him.  *See* Tr. 261; GX 253, 253-T.

The defendant also took and instructed Bradley and the CSes to take numerous other steps to avoid government detection, such as acting like "kufar" (like Americans) by purchasing and drinking alcohol, visiting a strip club in Queens, flirting with women, and downloading pornography on their phones.  *See* Tr.  270–78, 650–53; GX 286, 286-T, 287, 287-T, 288, 288-T, 313, 313-T, 708, 709 (photographs of strip club).  Additionally, the defendant ensured that he, Bradley, and the CSes strategically used credit cards for purchases that he wanted law enforcement to see (such as alcohol at the strip club and a plane ticket for a return flight back to the United States) but stated that they should not use credit cards for purchases that he did not want law enforcement to see or in locations where he did not want law enforcement to track him (such as Pakistan and Afghanistan).  *See* Tr. 261, 274–75; GX 223, 223-T.  The defendant also changed his appearance to look more "kufar" and less fundamentalist by trimming his beard, styling his hair, and wearing Western clothing.  *See* Tr. 67–68, 162–63, 174–75, 302, 658–661; GX 331, 331-T, 338, 338-T; *compare* GX 1 (photograph of defendant from before his arrest) *with* GX 2 (photograph of defendant from day of his arrest).

These steps were designed to disguise the defendant's radical extremism and adherence to terrorist ideology, so that he would not be identified, flagged, and stopped by law enforcement on his way to Afghanistan.  The defendant told CS-1 that "leaving this country with a dirty record will guarantee our ability to exit the country safely."  Tr. 277.  It was a strategy that the defendant believed al-Awlaki had followed to throw law enforcement off his trail, and the defendant sought to emulate the al Qaeda terrorist whom he so admired.  *See* GX 288, 288-T.  The defendant was

able to reconcile his "kufar" behavior with his fundamentalism, because in his mind, the ends justified the means. The defendant told CS-1 that their "ultimate goal was jihad for the sake of Allah, and Allah [would] understand that [they were] doing that for that purpose." Tr. 274–78.

One of the most significant evasive steps that the defendant took was to buy a plane ticket to Thailand instead of Pakistan. As described above, as early as the first recorded conversation with CS-1 on September 21, 2018, the defendant was aware that flying directly to Afghanistan would arouse suspicion. *See* GX 201, 201-T. The defendant therefore decided to fly directly to Pakistan, and then travel overland across the border from Pakistan into Afghanistan. *See* GX 201, 201-T. The defendant stated, "If we try to buy a ticket to Afghanistan, we might have an issue. They will stop us at the airport or something. But Pakistan, no. You go to Pakistan, right, because you can get to Afghanistan from Pakistan. There's a border you can cross." *See* GX 201, 201-T.

In or about March 2019, however, the defendant determined that his contemplated route from the United States to Pakistan to Afghanistan was not indirect enough to avoid arousing suspicion. As a result, the defendant decided that he would add another layer of remove, and instead of flying directly to Pakistan, he, Bradley, and the CSes would fly directly to Thailand. *See* Tr. 267–68, 588, 747. CS-1 testified that the defendant "always spoke about Thailand as a tour[ist] magnet, and going there was not suspicious." Tr. 268. Similarly, CS-2 testified that the defendant wanted to travel through both Thailand and Pakistan "[s]o the government does not have any eyes on us going straight to Afghanistan." Tr. 588.

According to the defendant's revised plan, they would travel from Thailand to Pakistan one of two ways. If they could get visas to travel from Thailand to Pakistan, they would fly to Pakistan; if they could not get visas, they would fly to Bangladesh, the defendant's country of

origin, then travel overland from Bangladesh to India, and from India overland to Pakistan.  *See* GX 288, 288-T.  From Pakistan, they would travel overland across the border into Afghanistan, as the defendant had always intended.  *See* Tr. 625, 747; GX 201, 201-T.

On March 23, 2019, the defendant bought himself a round-trip ticket from JFK Airport to Bangkok, departing JFK Airport on July 26, 2019, and instructed Bradley and the CSes to do the same.  *See* Tr. 96, 125; GX 140 (photograph of defendant's tickets to Bangkok), 501 (email receipt reflecting defendant's purchase of round-trip tickets from JFK Airport to Bangkok).  On the same day, the defendant also made a reservation for accommodations near Bangkok.  *See* GX 500 (email receipt reflecting defendant's reservation for accommodations near Bangkok).

On April 4, 2019, the defendant's concerns about flying directly to Pakistan were reinforced when he learned that another individual who was attempting to join the Taliban in Afghanistan by flying directly from the United States to Pakistan had been stopped at the airport. *See* Tr. 267–70, 649–50; GX 301, 301-T, 310, 310-T, 314, 314-T.  The defendant called an emergency meeting where he shared the news with Bradley and CS-1:

> Somebody got arrested. . . .  Some guy trying to do the same thing at the airport . . . .  This guy got arrested, he's 29 years old, he was trying to go to Pakistan, and they arrested him before he can get out.  So these things are possible. You can get arrested.  You must be very careful.  And when I say this, very careful, I mean completely leave your religion in terms of showing it off in any way to anyone.  'Cause your closest person that you think is close could be someone that works for the FBI.  This guy . . . told everything to the FBI because he thought . . . it was his friend.  You see what I'm saying?  This is not a joke. . . .  [T]he enemy is very powerful right now.  The enemy has eyes and ears everywhere we go.  We have to become like the enemy for us to go blend in so well, that they cannot . . . .

GX 301, 301-T.

At the meeting, when Bradley noted that the defendant had never explained "why Thailand," the defendant could not have been clearer in his response: "Oh, why Thailand. Because Thailand is the only place where they're never gonna suspect you're going there for terrorism. . . . From there we go Pakistan. But you can't fly straight to Pakistan. You see they got caught trying to fly to Pakistan." GX 310, 310-T.

Once the defendant had settled on Thailand as the best option to mask his final destination, he took additional steps to make himself look as much as possible like a legitimate tourist. He created online dating profiles and started flirting with women in Thailand; he bought gifts of perfume for those women; and he bought condoms, purportedly to use while having sex with those women, so that if authorities searched his bags at the airport, he would look like an amorous traveler, not a murderous one. *See* Tr. 141–43, 275–78, 484–85, 496–97, 672–78; GX 104, 288, 288-T, 328, 328-T, 329, 329-T, 340, 340-T, 341, 341-T, 509 (screenshots from "Vacation talk" WhatsApp group message thread including defendant and CSes).

The Thai women were also useful to the defendant as part of his plot because a Thai woman could pick up him and the CSes at the airport in Bangkok, *see* GX 329, 329-T, and potentially accompany them on their travel from Thailand to Pakistan, *see* GX 341, 341-T. The defendant explained his view that, if a Thai woman came along, "Our trip will seem more real. . . . Everything will be more natural. We won't get stopped anywhere. There's a woman with us. . . . It will . . . serve my purpose more . . . ." GX 341, 341-T. And if, for some reason, the Thai woman was unable to accompany the defendant and the CSes to Pakistan and Afghanistan, the defendant would "leave her behind." GX 339, 339-T.

To facilitate his travel from Thailand to Pakistan and Afghanistan, the defendant also started communicating online with a woman in Bangladesh whom the CSes knew as "Emira." *See* Tr. 289–93, 674–80, 691–93; GX 338, 338-T, 342, 342-T, 343, 343-T.  The defendant explained that Emira was "perfect for this job for us," *see* GX 338, 338-T—meaning the "job" of their "mission," which was "going to do jihad," *see* Tr. 291—because she was "smart," did "research," and when the defendant told her to do something, she did it "right away," *see* GX 338, 338-T.  The defendant expected Emira to help arrange visas for their travel.  *See* Tr. 692–93.  He also expected that Emira would contribute money to their "cause," *see* GX 342, 342-T—that is, the cause of going to "Afghanistan" and "attack[ing]," *see* Tr. 292—because she had money and was "from the richest area in Bangladesh," *see* GX 342, 342-T.

By taking these steps in an attempt to conceal his ultimate destination and intentions, the defendant was following a playbook that other foreign fighters have followed to surreptitiously leave the United States and other Western countries to join the Taliban and other terrorist organizations.  As Taliban expert Dr. Tricia Bacon testified, foreign fighters like the defendant "do things to disguise their travel and their destination," and "sometimes do things to alter their appearances, so they would appear less suspicious to authorities."  *See* Tr. 544–45.  For example, "[t]hey might stop at another country that was not necessarily a natural route, or they would have some kind of business-related reason that they said they were traveling."  *See* Tr. 545.  Indeed, the "typical route" that foreign fighters have followed in recent years when traveling from the United States and other Western countries to Afghanistan is through "[a] third country," and then Pakistan. *See* Tr. 543.

20

### H.  Hossain Travels to JFK Airport, Attempts to Board His Flight to Thailand, and Is Arrested

On July 25, 2019, at the defendant's instruction, CS-1 took a taxi to the vicinity of the defendant's residence in the Bronx, where the taxi picked up the defendant and proceeded to a hotel in Queens near JFK Airport.  *See* Tr. 301–02.  The defendant had previously instructed CS-2 to book a room at the hotel for the defendant and the CSes to stay in the night before their flight to Bangkok, which CS-2 had done.  *See* Tr. 687–88; GX 335, 335-T, 710 (photograph of the hotel). At the hotel, the defendant and CS-1 went to the room, where they met with CS-2.  *See* Tr. 302. CS-2 was wearing a long white robe.  *See* Tr. 302.  When the defendant saw what CS-2 was wearing, the defendant reminded CS-2 that he had told him not to wear religious attire while they were traveling.  *See* Tr. 302.

The defendant and the CSes had brought to the hotel the supplies that the defendant had ordered and the cold-weather clothing that they had bought to use in Afghanistan, along with several pieces of luggage in which to transport the supplies and clothing.  *See* Tr. 688–89.  In the room, the defendant repacked the supplies and clothing in the luggage, deciding which items went into which bags.  *See* Tr. 688–89.  The defendant also asked the CSes if they had the $10,000 in cash that they were each supposed to bring with them.  *See* Tr. 303.  The defendant pulled out his own approximately $10,000 in cash, handed it to CS-2, and instructed CS-2 to count it.  *See* Tr. 303.  CS-2 counted approximately $10,400.  *See* Tr. 303.  Eventually, the defendant and the CSes prayed and went to bed.  *See* Tr. 303, 688.

On July 26, 2019, the next morning, the defendant and the CSes left the hotel and traveled to JFK Airport, where they checked the luggage the defendant had packed, went through security,

and proceeded to the gate for their flight to Bangkok. *See* Tr. 30, 689–91. Shortly thereafter, their flight was called, and they started walking down the jet bridge toward the plane. *See* Tr. 304, 694. As they were walking down the jet bridge, the defendant shook hands with CS-1 and stated, "We've made it." *See* Tr. 304. At that point, law enforcement agents posing as fellow passengers arrested the defendant and the CSes on the jet bridge. *See* Tr. 65–68, 304–05, 694. During a search incident to the defendant's arrest, law enforcement found $10,100 in cash on his person. *See* Tr. 117–18; GX 140, 420, 810.

After the defendant's arrest, and pursuant to a judicially authorized warrant, law enforcement searched the luggage. *See* Tr. 68–70, 98–118. During the search, among other items, law enforcement found the supplies and the clothing. *See* Tr. 68–70, 98–118; GX 100–40 (photographs of items recovered during search of luggage), 407–08, 410–20, 424–35 (physical evidence recovered during search of luggage).

## II.   Procedural History

On July 26, 2019, the defendant was charged by complaint in this District with one count of attempted provision of material support and resources for terrorism, in violation of 18 U.S.C. § 2339A. *See* Dkt. No. 1. On October 13, 2020, a grand jury sitting in this District returned the Indictment, charging the defendant with one count of attempted provision of material support and resources for terrorism, in violation of 18 U.S.C. § 2339A (Count One), and one count of attempting to make or receive a contribution of funds, goods, and services to the Taliban, in violation of 50 U.S.C. § 1705(a) and 31 C.F.R. §§ 595.204, 595.205, and 594.310 (Count Two). *See* Dkt. No. 55.

Trial on the Indictment began on September 29, 2021. The Government presented an array of witness testimony and other evidence, including recordings of the defendant's meetings with his co-conspirators and the CSes, demonstrating his participation in the plot to join and fight with the Taliban, as described above. On October 8, 2021, the jury returned a verdict of guilty on both counts, and the Court remanded the defendant.

On January 18, 2022, Probation issued the PSR. In the PSR, Probation calculated the defendant's offense level as 51. *See* PSR ¶ 26. Because an offense level of 51 exceeds the most serious possible offense level, the Guidelines automatically reduce it to level 43. *See id.* ¶ 29 (citing U.S.S.G. Chapter 5, Part A, Application Note 2 (discussing the "rare cases" in which "a total offense level of . . . more than 43 may result from application of the guidelines"). Probation further determined that, although the defendant has zero criminal history points, his Criminal History Category is VI because his offense involved a federal crime of terrorism. *See* PSR ¶ 32 (citing U.S.S.G. § 3A1.4(b)).

At offense level 43 and Criminal History Category VI, the Guidelines range would be life imprisonment. *See* PSR 15. Indeed, the Guidelines range would be life imprisonment even if the defendant's Criminal History Category was I instead of VI. *See* U.S.S.G. Sentencing Table. Here, however, the statutory maximum penalty that the Court may impose is 35 years—15 years on Count One, and 20 years on Count Two—so the effective Guidelines range is 420 months' imprisonment. *See* PSR 15. Probation recommends a sentence of 300 months' imprisonment.

## DISCUSSION

### I.   Applicable Law

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  After that calculation, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant"; the four legitimate purposes of sentencing, as set forth below; "the kinds of sentences available"; the applicable Guidelines range itself; any relevant policy statement by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants"; and "the need to provide restitution to any victims."  18 U.S.C. § 3553 (a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553 (a)(2).

### II.   Probation Correctly Calculated the Guidelines Range as 420 Months' Imprisonment

As described above, Probation calculated an offense level of 43 and a Criminal History Category of VI, yielding an effective Guidelines range of 420 months' imprisonment.  *See* PSR 15.  The offense level was driven by Probation's determination that the base offense level for

24

Count One was 33, "because the object of the intended offense would have constituted first degree murder," PSR ¶ 20; that a six-level enhancement was appropriate, "because the intended victim was a government employee, and the offense was motivated by such," *id.* ¶ 22; and that a 12-level enhancement was appropriate, because "[t]he offense is a felony that involved, or was intended to promote, a federal crime of terrorism," *id.* ¶ 23.

Defense counsel claim that Probation's calculations are incorrect for three reasons: first, because "Probation's proposed cross reference to attempted murder to form a base offense level of 33 is wrong," Def.'s Mem. 12–14; second, because Probation incorrectly applied the six-level official-victim enhancement, *see id.* at 14; and third, because Probation incorrectly applied the 12-level terrorism enhancement, *see id.* at 14–16.   The Court should reject all three of these arguments because Probation's calculations were clearly correct under the Guidelines.

### A.  Probation Correctly Calculated the Base Offense Level as 33

Regarding the base offense level for Count One, U.S.S.G. § 2X2.1 applies, pursuant to Appendix A to the Guidelines, to the defendant's violation of 18 U.S.C. § 2339A.   U.S.S.G. § 2X2.1, in turn, provides that "[t]he offense level is the same level as that for the underlying offense," and Application Note 1 to U.S.S.G. § 2X2.1 explains that, "in the case of a violation of 18 U.S.C. § 2339A . . . , 'underlying offense' means the offense the defendant is convicted of having materially supported . . . prior to or during its commission."

Here, the offense that Hossain was convicted of having attempted to materially support was a violation of 18 U.S.C. § 2332, the killing of a national of the United States while such national is outside the United States.   Probation determined that the defendant was convicted of having attempted to materially support a violation of 18 U.S.C. § 2332(b)(1), attempt with respect

to homicide, and that the applicable guideline was therefore U.S.S.G. § 2A2.1, which provides that, "if the object of the offense would have constituted first degree murder," the base offense level is 33. U.S.S.G. § 2A2.1(a)(1). Probation therefore correctly found that a base offense level of 33 was appropriate.

Defense counsel take issue with this determination. According to defense counsel, "[t]he Government has not proved by a preponderance of the evidence that the material support Mr. Hossain was convicted of attempting to provide is tantamount to attempted first degree murder because it has not proved that Mr. Hossain had the specific intent to kill anyone." Def.'s Mem. 12. This argument is merely a repackaged version of an argument that defense counsel made at the charge conference and in their post-trial motions, which the Court properly rejected both times: that the Government was required to prove that Hossain had the "specific intent or conscious objective to join the Taliban for the purpose of killing United States soldiers." Tr. 854.

As the Court correctly held, this argument is meritless, because it conflates the specific intent required to prove an attempted commission of the charged offense, which is 18 U.S.C. § 2339A, with the specific intent required to prove an attempted commission of the predicate offense, which is 18 U.S.C. § 2332. The Government was required to prove the former, but not the latter. *See* Tr. 875 ("The specific intent under Count One doesn't have to be the specific intent to accomplish the killing of U.S. nationals abroad. [The required] [s]pecific intent is that the defendant provided the support with knowledge it's to be used in carrying out the underlying offense, which is the killing of U.S. nationals abroad."); *see also* Tr. 894–95 (rejecting the defendant's argument that his "specific intent appl[ies] not only to the provision of himself as

26

personnel for the purpose of carrying out a violation of 2332, but that his conscious objective also be to accomplish a violation of 2332").

Here, once more, defense counsel conflate the requisite *mens rea* for violations of the charged and predicate offenses. U.S.S.G. § 2A2.1(a)(1) and its base offense level of 33 apply not because the defendant attempted to commit a violation of 18 U.S.C. § 2332 (*i.e.*, because the defendant had the specific intent to kill U.S. nationals abroad), but because—pursuant to U.S.S.G. § 2X2.1—the defendant attempted to commit a violation of 18 U.S.C. § 2339A with a violation of 18 U.S.C. § 2332 as the underlying predicate offense thus triggering U.S.S.G. § 2A2.1 (*i.e.*, because the defendant knew or intended that the material support he attempted to provide to the Taliban would be used in preparation for or in carrying out the Taliban's killing of U.S. nationals abroad). Accordingly, the application of U.S.S.G. § 2A2.1(a)(1) is the ineluctable result of the defendant's conviction on Count One at trial.

It is worth noting that U.S.S.G. § 2A2.1(a)(1) would still apply even if the Court adopted defense counsel's erroneous legal standard (which it should not), because the Government proved at trial by at least a preponderance of the evidence that Hossain had the specific intent to kill U.S. nationals abroad. As described above, the defendant spoke of killing Americans on multiple occasions and laughed as he imagined killing U.S. servicemembers in Afghanistan with AK-47s, pistols, and rocket launchers. *See* Def.'s Mem. 16 (acknowledging that, "[t]aken in a light most favorable to the Government, perhaps one or two of Mr. Hossain's recorded communications with [CS-1 and CS-2] captured him talking about shooting U.S. soldiers"). It is also worth noting that, if U.S.S.G. § 2A2.1(a)(1) and its base offense level of 33 did not apply (which it does), then U.S.S.G. § 2A2.1(a)(2) and its base offense level of 27, only six levels lower, would apply,

yielding a total offense level of 45 instead of 51.  Thus, even if defense counsel were correct, the Guidelines range would be unaffected.  Regardless, Probation's calculation of the base offense level was correct, and defense counsel's argument is baseless.

### B.  Probation Correctly Applied the Six-Level Official-Victim Enhancement

Defense counsel also challenge the applicability of a six-level official-victim enhancement, pursuant to U.S.S.G. § 3A1.2(b), because the intended victim was a government employee, and the offense was motivated by such.  As relevant here, U.S.S.G. § 3A1.2(a) provides that, "[i]f (1) the victim was . . . a government officer or employee . . . ; and (2) the offense of conviction was motivated by such status, increase by 3 levels."  U.S.S.G. § 3A1.2(b) provides that, "[i]f subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person), increase by 6 levels."  Application Note 1 to U.S.S.G. § 3A1.2 explains that "[t]his guideline applies when specified individuals are victims of the offense.  This guideline does not apply when the only victim is an organization, agency, or the government."  Defense counsel argue, cursorily, that "Mr. Hossain only sought to provide support to the Taliban, and he did so with (at best) an amorphous desire to fight the United States Government.  He did not intend to harm any specific person.  Considering there was no named victim in this case—and not a single person was harmed in the execution of this criminal acts [sic]—this enhancement cannot, and should not, apply."  Def.'s Mem. 14.

Defense counsel do not cite any authority in support of their construction of U.S.S.G. § 3A1.2, and their construction has been specifically rejected by at least several courts, including another court in this District.  In *United States v. Cromitie*, No. 09 Cr. 558, 2011 WL 2693293 (S.D.N.Y. June 29, 2011), the defendants "intended to kill, injure, or maim federal employees at

28

the Air National Guard Base solely because those persons worked for the U.S. government." *Id.*
at *6 (alterations and internal quotation marks omitted) (quoting *United States v. Polk*, 118 F.3d
286, 298 (5th Cir. 1997) (affirming application of official-victim enhancement in sting case where
defendant told confidential source that he wanted to attack IRS service center and prepared
accordingly)). The court applied the official-victim enhancement, and explained its decision to do
so as follows:

> An individual need not be harmed, or even knowledgeable of the crime, to be a
> victim. Just because federal employees were not actually killed or injured or that
> the defendants did not know the names of their intended victims does not preclude
> application of the three-level enhancement. There is no requirement that federal
> employees be named for the three-level enhancement to apply. Instead, for
> purposes of this enhancement, [a]ny attempt or conspiracy to cause injury or
> damage is basically the same crime as actually succeeding in causing the injury or
> damage.

*Cromitie*, 2011 WL 2693293, at *6 (alterations, citations, and internal quotation marks omitted).

Here, as the jury found, the defendant attempted to provide material support to the Taliban,
knowing or intending that such support would be used in preparation for or in carrying out the
Taliban's killing of U.S. nationals abroad. The evidence at trial established that the defendant
intended to support the Taliban in its continuing mission to kill U.S. servicemembers and other
individuals working for the U.S. government. To take just one example, on September 21, 2018,
the very first time that Hossain discussed his plan to join the Taliban with CS-1, he told CS-1 that
he would "fight the American government, from there, . . . combined with the
Taliban . . . . You've got U.S. government . . . The U.S. government, army, is over there

in . . . Afghanistan. . . . We fight them over there.   Because then we'll be with the

mujahideen . . . ."  GX 203, 203-T.  The official-victim enhancement applies.

### C.  Probation Correctly Applied the 12-Level Terrorism Enhancement

Regarding the terrorism enhancement, as relevant here, U.S.S.G. § 3A1.4(a) provides that,

"[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism,

increase by 12 levels."  Application Note 1 to U.S.S.G. § 3A1.4 provides that, "[f]or purposes of

this guidelines, 'federal crime of terrorism' has the meaning given that term in 18 U.S.C.

§ 2332b(g)(5)."  Section 2332b(g)(5) defines "federal crime of terrorism" as an offense that "(A)

is calculated to influence or affect the conduct of government by intimidation or coercion, or to

retaliate against government conduct; and (B) is a violation of" certain enumerated statutes,

including 18 U.S.C. § 2339A, the offense of which the defendant was convicted in Count One, and

18 U.S.C. § 2332, the predicate offense for Count One.  18 U.S.C. § 2332b(g)(5).

Defense counsel's first argument regarding why the terrorism enhancement does not apply

can be rejected out of hand, as it amounts to little more than their expression of their opinion that

the enhancement is unduly harsh and "bad anti-terrorism policy."  *See* Def.'s Mem. 14–16.  The

Guidelines apply even if defense counsel disagree with them, and the Second Circuit has

repeatedly upheld the application of the enhancement in terrorism cases, as discussed below.

In 1994, Congress mandated that the U.S. Sentencing Commission establish a Guidelines

enhancement for terrorism offenses to ensure that defendants convicted of such crimes receive

punishment commensurate with the extraordinary nature of their conduct.  *See United States v.*

*Mumuni*, 946 F.3d 97, 112 & n.64 (2d Cir. 2019) (citing Violent Crime Control and Law

Enforcement Act of 1994, Pub. L. No. 103-322, § 120004, 108 Stat. 1796, 2022).  The resulting

enhancement set forth in U.S.S.G. § 3A1.4(a), which not only increases the applicable offense level by 12 but also places defendants in Criminal History Category VI, reflects Congress's intent that defendants convicted of terrorism offenses serve sentences that are appropriate in light of their uniquely dangerous crimes and risk of recidivism:

> The import of this enhancement "could not be clearer": It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."

*United States v. Stewart*, 590 F.3d 93, 172-73 (2d Cir. 2009) (Walker, J., concurring in part) (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003)); *accord United States v. Ceasar*, 10 F.4th 66, 79 (2d Cir. 2021).

Defense counsel's second argument regarding why the terrorism enhancement does not apply fares no better. As an initial matter, defense counsel misstate the law. Without any supporting citation, they claim that, "[i]n order to sustain the terrorism enhancement, the Government must establish that the defendant had the specific intent to commit an offense that was 'calculated' to impact or retaliate against government conduct." Def's Mem. 16. But in *United States v. Awan*, 607 F.3d 306 (2d Cir. 2010)—a case that defense counsel themselves cite in the same paragraph—the Second Circuit explicitly rejected this formulation.

As the Second Circuit explained, "the disjunctive phrase from U.S.S.G. § 3A1.4"—"[i]f the offense . . . involved, or was intended to promote, a federal crime of terrorism"— "makes clear that the predicate offense must either (1) 'involve' a federal crime of terrorism or (2) be 'intended to promote' a federal crime of terrorism, and that each clause has a separate meaning." *Awan*, 607 F.3d at 313.

Regarding the "involve" clause, "the ordinary meaning of 'involved' is 'to have within or as part of itself,' or to 'include.' . . . Thus, a defendant's offense 'involves' a federal crime of terrorism when his offense includes such a crime, *i.e.,* the defendant committed, attempted, or conspired to commit a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5), or his relevant conduct includes such a crime." *Id.* at 313–14.

Regarding the "intended to promote" clause, "[t]he ordinary meaning of 'promote' includes 'to bring or help bring into being,' to 'contribute to the growth, enlargement, or prosperity of,' or to 'encourage' or 'further.' . . . [A]n offense is 'intended to promote' a federal crime of terrorism when the offense is intended to help bring about, encourage, or contribute to a federal crime of terrorism as that term is defined in 18 U.S.C. § 2332b(g)(5)." *Id.* at 314 (citations omitted). "[T]his has an important implication: . . . Under the 'intended to promote' prong, . . . so long as the defendant's offense was intended to encourage, further, or bring about a federal crime of terrorism as statutorily defined, the defendant himself does not have to commit an offense listed in § 2332b(g)(5)(B), and the defendant's offense need not itself be 'calculated' as described in § 2332b(g)(5)(A)." *Id.* Thus, contrary to defense counsel's misstatement of the law, "the application of § 3A1.4 in such circumstances does not require a finding that [a defendant] was personally motivated by a desire to influence or affect the conduct of government. Rather, the government need only demonstrate that [the defendant] intended to promote a crime calculated to have such an effect, *i.e.,* that his offenses were intended to promote a federal crime of terrorism as defined in § 2332b(g)(5), whatever [the defendant's] reason for committing them." *Awan*, 607 F.3d at 315–16.

Here, the evidence introduced at trial easily satisfies both the "involve" and "intended to promote" clauses by a preponderance of the evidence. Count One "involve[d]" a federal crime of terrorism because Hossain "attempted . . . to commit," *id.* at 313, a violation of 18 U.S.C. § 2339A, which is listed in 18 U.S.C. § 2332b(g)(5)(B), and his crime was "calculated to influence or affect the conduct of government by intimidation or coercion, or retaliate against government conduct," as required by 18 U.S.C. § 2332b(g)(5)(A). As Hossain discussed with CS-1, CS-2, and Bradley on numerous occasions, the main reason why Hossain wanted to join the Taliban was to fight in their jihad, the primary purpose of which was to intimidate and coerce the U.S. and other coalition governments into withdrawing from Afghanistan, and to retaliate against the U.S. and other coalition governments for invading and occupying Afghanistan.

For example, on September 21, 2018, the first time that Hossain discussed his plan to join the Taliban with CS-1, he told CS-1 that he would "fight the American government, from there, . . . combined with the Taliban . . . . You've got U.S. government . . . The U.S. government, army, is over there in . . . Afghanistan. . . . We fight them over there. Because then we'll be with the mujahideen . . . ." GX 203, 203-T. On multiple occasions, including during an April 4, 2019 recorded conversation with CS-1, Hossain stated that he wanted "to kill some kufar before [he] die[d]," GX 309, 309-T, by which he meant Americans, *see, e.g.*, Tr. 272–73, 294–95, 481, 536, 602, 647, 650–51. In the WhatsApp group message threads, the YouTube video titled "Behind The Taliban Mask: The Other Side of Afghanistan's Front-line," depicted members of the Taliban carrying assault rifles; using the rifles, rocket launchers, and other heavy weaponry to attack U.S. and coalition forces in Afghanistan; and discussing the many U.S. servicemembers whom the Taliban had killed. *See* Tr. 843–46; GX 538, 1001–02, 1004, 1011.

33

Further, Dr. Bacon testified that, during the insurgency that started around 2005 and lasted through 2019, the year of the defendant's arrest, the Taliban "would constantly talk about the need to expel [U.S. and coalition forces] as part of a jihad"—that is, their "religious duty to expel foreign forces from Afghanistan." Tr. 536. Influencing, affecting, and retaliating against the United States was the core rationale of that jihad. *See*, *e.g.*, Tr. 535–36 (explaining that "[t]he Taliban developed a sort of hierarchy of targets, and the Coalition Forces were its top target"); Tr. 539 (explaining that, in 2018, "[t]here [were] more indications that the U.S. and the Taliban would engage in negotiations," "[s]o the Taliban was in a situation where it was trying to really gain a military advantage, so it could bring that to the negotiating table" with the United States); Tr. 540 (explaining that, in 2019, "the United States and the Taliban were negotiating," "[a]nd the Taliban was continuing its military offensive").

Additionally, Dr. Bacon testified that the United States contributed the largest number of military servicemembers and resources to the coalition fighting against the insurgency, and that the United States was the coalition's "backbone." *See* Tr. 532–35; 541–42. Dr. Bacon also testified that, by 2019, the Taliban had killed "[a] little over 6,000" Americans in Afghanistan, including U.S. servicemembers. Tr. 538. The Taliban specifically killed U.S. servicemembers in 2018 and 2019. *See* Tr. 539–41. In other words, in 2019, fighting with the Taliban realistically meant fighting against the United States and attempting to kill or killing U.S. servicemembers.

It is also important to keep in mind that, before Hossain settled on traveling to Afghanistan, joining the Taliban, and fighting in their jihad against U.S. and coalition forces, he planned to attack a U.S. military recruiting station in the Bronx. *See* Tr. 174–76, 179–81, 187, 190–98, 536–37, 682; GX 201, 201-T, 202, 202-T, 203, 203-T, 204, 204-T, 336, 336-T, 1014. Hossain told

34

CS-1 that attacking the recruiting station would be legitimate because of the war against the U.S. government.  *See* GX 201, 201-T.  Although this plot fortunately never came to fruition because Hossain shifted his focus to Afghanistan and the Taliban, it further highlights the extent to which his goal was always to target U.S. forces in their capacity as representatives of the U.S. government, which he wanted to influence, affect, and retaliate against.

In the alternative, Count One was also "intended to promote" a federal crime of terrorism because Hossain intended "to help bring about, encourage, or contribute to," *Awan*, 607 F.3d at 314, the Taliban's killing of U.S. nationals in Afghanistan, in violation of 18 U.S.C. § 2332, which is also listed in 18 U.S.C. § 2332b(g)(5)(B).  There can be no dispute—and defense counsel do not dispute—that the primary purpose of the Taliban's killing of U.S. servicemembers and other U.S. nationals in Afghanistan was to intimidate and coerce the U.S. Government into withdrawing from Afghanistan, and to retaliate against the U.S. Government for invading and occupying Afghanistan.  As discussed above, the trial evidence clearly established that the material support and resources that Hossain attempted to provide to the Taliban were intended "to help bring about" and "contribute to" those killings.  At a bare minimum, Hossain intended to "encourage" them.

Lastly, courts have regularly applied the terrorism enhancement in cases involving violations of 18 U.S.C. §§ 2339A, 2339B, and related offenses, including in similar factual circumstances.  *See*, *e.g.*, *United States v. Kaziu*, No. 09 Cr. 660 (JG) (E.D.N.Y.) (applying terrorism enhancement where defendant was convicted of conspiracy to provide material support and resources to Taliban, in violation of 18 U.S.C. § 2339A, among other offenses, after defendant was arrested in Kosovo shortly before planned trip to Pakistan, from which he planned to travel to Afghanistan, join Taliban, and fight in Taliban's jihad against U.S. and coalition forces); *U.S. v.*

*Mohammed*, No. 06 Cr. 357 (CKK) (D.D.C.) (applying terrorism enhancement where defendant was convicted of narco-terrorism, in violation of 21 U.S.C. § 960a, after defendant trafficked narcotics and provided some of proceeds to Taliban); *see also United States v. El Bahnasawy*, No. 16 Cr. 376 (RMB) (S.D.N.Y.) (applying terrorism enhancement over defense objection where defendant was convicted of conspiring to carry out a terrorist bombing on behalf of ISIS in New York City); *United States v. Alimehmeti*, No. 16 Cr. 398 (PAE) (S.D.N.Y.) (applying terrorism enhancement over defense objection where defendant was convicted of attempting to provide material support to ISIS by facilitating travel of ISIS supporter to join ISIS overseas, and specifically rejecting argument that Government had failed to show defendant's conduct was directed at impacting government conduct); *United States v. Rahimi*, No. 16 Cr. 760 (RMB) (S.D.N.Y.) (applying terrorism enhancement where defendant was convicted of carrying out terrorist bombings in Chelsea neighborhood of Manhattan and New Jersey).

Based on the foregoing, Hossain's commission of Count One both "involved" and was "intended to promote" a federal crime of terrorism.  The terrorism enhancement applies.

## III.    The Sentencing Factors Call for a Guidelines Sentence

### A.  The Seriousness of the Offenses, Promoting Respect for the Law, and Providing Just Punishment for the Offenses Warrant a Guidelines Sentence

The seriousness of Hossain's offenses, promoting respect for the law, and providing just punishment for the offenses weigh decidedly in favor of a Guidelines sentence.  *See* 18 U.S.C §§ 3553(a)(1), 3553(a)(2)(A).  Any terrorism offense is inherently serious, but consideration of Hossain's background, the context in which he committed his offenses, and the specific details of those offenses underscore the egregious nature of his conduct and support a Guidelines sentence.

36

Hossain was born in Bangladesh in 1985.  *See* PSR ¶ 37.  When he was born, Bangladesh was in the midst of extreme economic hardship and political turmoil that saw the president assassinated in 1981; the new president overthrown in a coup d'état in 1982; a new president installed in 1983; martial law imposed until 1986; and a mass uprising forcing the president's resignation in 1990.  When Hossain was 10 years old, he and his family left Bangladesh and moved to the United States, settling on the Lower East Side of Manhattan.  *See id.* ¶ 41.  Hossain learned English quickly, and by sixth grade, he was winning awards for academic excellence.  *See id.* When he was around 13 years old, he became a naturalized U.S. citizen.  *See id.* ¶ 37.

In 2005, Hossain began attending Monroe College in the Bronx, from which he graduated with a Bachelor of Science degree in Criminal Justice in 2009.  *See id.* ¶ 54.  Hossain reportedly graduated in the top 10 students in his class, with a 3.4 grade point average and academic honors. *See id.*  After graduating, he wanted to attend law school, but he put those plans on hold to resume working and providing financial support for his family.  *See id.* ¶ 41.  Between 2009 and his arrest in 2019, Hossain worked as a taxi and Uber driver in New York City.  *See id.* ¶¶ 41, 44, 57–59.

The picture of Hossain that emerges from the PSR and the Government's investigation is that of an individual who immigrated from a politically unstable country with limited economic opportunities to the United States when he was a boy, and who, through hard work, perseverance, and natural ability, learned English, thrived at college, obtained gainful employment, and hoped to someday attend graduate school and join the professional ranks.  Yet despite the opportunities that the United States had afforded him, and that he had taken advantage of, Hossain decided to take up arms against his country and kill his fellow citizens.

This is not a case, for example, in which an immature teenager in a foreign country, with no direct contact with Americans and little life experience, is radicalized on the Internet by a terrorist group peddling lies about the United States and exploiting his naivete or lack of opportunity. At present, the defendant is 36 years old. He was 33 when he committed his offenses. He has been married twice and has three children. He has a college degree. He has been working in a variety of jobs since he was in eighth grade. He knows the United States because he has lived here since he was a child; he knows Americans because he is a citizen himself.

Hossain is smart and sophisticated. That is clear not only from his educational attainment but also from the evidence introduced at trial. He carefully analyzed, parsed, and mulled the extremist propaganda he was consuming, and did not adopt it wholesale and without question. For example, Hossain was meticulous in his appraisal of al-Awlaki and al Qaeda's propaganda, so much so that he became concerned that a lone-wolf attack in the United States inspired by that propaganda might be too doctrinally controversial to guarantee his place and stature as a martyr for his extremist cause. Extensive research and thought, and his resultantly deep understanding of the nuances and subtleties of radical Islamic terrorist ideology, caused him to shift his focus from attacking Americans in the United States to attacking Americans in Afghanistan.

Nor is this a case in which a radicalized individual joins a foreign terrorist organization with the desire to achieve some broader or more abstract goal—for instance, a foreign country's adoption of shariah law or the establishment of a fundamentalist Islamic caliphate in the Middle East—while being aware at some level that the organization may incidentally kill Americans, but not actively planning to kill Americans himself. In Hossain's case, killing Americans was not an unintended consequence of the offense—it was the offense's core purpose. To convict Hossain

on Count One, the jury had to find that Hossain knew or intended that the material support or resources he was attempting to provide to the Taliban would be used in preparation for or in carrying out the killing of Americans abroad.

Despite all of his life experience, intelligence, and sophistication, Hossain chose to turn against his own community and attempt to perpetrate violence against it.  Hossain's adoption of radical Islamic terrorist ideology was a clear, careful, and conscious choice, not the inevitable result of "years of personal tumult," as defense counsel seem to suggest.  Def.'s Mem. 1.  Many people in the United States have difficult marriages, limited resources, and strained relationships with their parents.  But the overwhelming majority of those people never even commit petty crimes, much less take substantial steps toward committing terrorism offenses and killing other Americans.  Nor do they seek to abandon their families, including their young children, to embrace an odious ideology that at its core teaches hatred for America.  And that is exactly what Hossain did here.  *Cf.* PSR ¶ 16 (noting that Probation did not "uncover any mitigating circumstances during the presentence investigation," and that Hossain "was apparently reared under decent circumstances").

In *United States v. Raishani*, No. 17 Cr. 421 (RA) (S.D.N.Y.), Judge Ronnie Abrams addressed a similar situation, in which the defendant was a naturalized citizen who had come to the United States as a boy (five years old) from a country with less opportunity (Yemen); the defendant was well-educated (college degree) and in his thirties (32); and the defendant sought to leave his wife and young child behind in the United States to join a foreign terrorist organization abroad (ISIS).  Judge Abrams rejected defense counsel's argument that the defendant's college

degree and age were mitigating factors, finding instead that they were aggravating features of his

crime, and imposed the statutory maximum penalty for the defendant's material-support offense:

> But doesn't [the defendant's college degree] make him more blameworthy rather
> than less[?]  It's different if you have a kid, if you have someone young and
> impressionable, there are cases with people who have some form of mental illness.
> But this is not that case, this is someone who is a full-grown adult who made this
> decision knowingly to radicalize. . . .
>
> He wasn't a kid.  He was in his late 20s.  He was almost 30.  He's 32 now.  He had
> a child, a degree, he's a nurse.  This is not a kid.  If this was a kid, I could understand
> the argument. . . .
>
> Unlike in some of the material support cases where, like I referred to earlier that
> I've reviewed where a defendant was young or had mental health issues, Mr.
> Raishani is a 32-year-old, naturalized United States citizen, with a college degree,
> a former job as a nurse, and devoted parents, wife, and a young son.  Those are not
> mitigating factors.  Nonetheless, he sought to join a terrorist organization whose
> mission it is to murder nonbelievers.

*Raishani*, No. 17 Cr. 241, Dkt. No. 62 (Apr. 2, 2019 Sent. H'r'g Tr. 14–28).

The same is true of Hossain.  With his eyes wide open, after careful planning and over an

extended period, he made the most momentous decision of his life: to travel to Afghanistan, join

the Taliban, and kill Americans.  He now seeks to avoid the consequences of that decision by

blaming others for what he did.  The Court should not countenance that effort.

In their sentencing submission, defense counsel attempt to paint a different picture of

Hossain, but it cannot be squared with the actual evidence that was presented at his week-long

trial.  Defense counsel's characterization of the relationship between Hossain and CS-1 is

especially baseless.  According to defense counsel, it was CS-1, and not Hossain, who "extolled

the virtues of ISIS and Anwar al-Awlaki" and "show[ed] Mr. Hossain ISIS propaganda videos,"

in response to which Hossain "took it upon himself to show [CS-1] why ISIS and al-Awlaki

represented deviations from the true Islam, which embraced a different conception of jihad and the utility of 'holy war.'"  Def.'s Mem. 5–6.  Defense counsel claim that "Mr. Hossain saw it as his responsibility to correct [CS-1's] course away from ISIS."  *Id.* at 6.  In other words, the defendant's submission essentially seeks to blame CS-1 for Hossain's decision to take the path that ultimately led to his arrest, prosecution, and conviction.  *See* PSR ¶ 44 (Hossain "believes [CS-1] took advantage of his compromised emotional state").[3]

This argument is meritless.  There is no evidence that supports any aspect of defense counsel's narrative.  To the contrary, the overwhelming evidence at trial showed that it was Hossain who approached and befriended CS-1; Hossain who expressed admiration for al-Awlaki, al Qaeda, and the Taliban, and introduced those topics to CS-1; Hossain who researched and shared with CS-1 propaganda promoting radical Islamic terrorist ideology; Hossain who embraced that ideology; Hossain who developed a sophisticated plan to join the Taliban and recruited CS-1 into his plot; and Hossain who took those actions of his own accord, without being pressured by anyone else, least of all CS-1, who Hossain asked to swear an oath of loyalty to him as his leader.

Defense counsel also rehash their contentions about the purported lack of specificity in Hossain's travel plans or direct contact with the Taliban.  *See* Def.'s Mem. 1, 6-7.  This is a tired argument that the Court rejected at the close of the Government's case; that the jury rejected during

---

[3] There was extensive pretrial litigation regarding whether defense counsel would be permitted to open at trial on entrapment, based on a theory that Hossain was purportedly entrapped primarily by CS-1; the Court ruled that defense counsel were not permitted to open on entrapment, based on the lack of any proffered entrapment evidence; defense counsel nonetheless violated the Court's ruling in their opening; and ultimately, confirming the correctness of that ruling, there was no testimony whatsoever elicited from CS-1 on direct or cross-examination that in any way supported an entrapment defense.  *See*, *e.g.*, Tr. 75–79, 945-46.

their deliberations; and that the Court rejected again in denying Hossain's post-trial motions.  As described above, even though there was no evidence introduced at trial that Hossain had established contact with the Taliban, there was ample evidence that he had researched the Taliban and learned that perhaps the easiest way of getting connected with them was through pro-Taliban mosques and leaders in Pakistan.  He had identified at least one mosque in Pakistan where the imam encouraged individuals to fight in the Taliban's jihad and had watched videos about the mosque on YouTube.  He believed that, if he traveled to Pakistan, all he had to do was find that mosque to get connected with the Taliban.  Hossain also sent a Facebook message to Hamid, the former Taliban fighter and current Taliban supporter, in an effort to get connected with the Taliban.  Even though Hamid did not respond, Hossain planned to find Hamid in Pakistan, where Hamid moved around without security.

Further, Dr. Bacon testified that, for many foreign fighters seeking to join the Taliban, a lack of contact with the Taliban before they arrive in Pakistan is common, and it is not difficult for foreign fighters to get connected with the Taliban in Pakistan after they arrive.  *See* Tr. 545–46 (testifying that "[t]here was a lot of recognition that electronic communications would be vulnerable to interception[,] [s]o there was a tendency to avoid that kind of communication until someone arrived in Pakistan"; that the Taliban "were in major cities, they had connections in many mosques, in many madrasas, so they were not hard to find in Pakistan"; and that "[i]t was not particularly difficult" for foreign fighters to get connected with the Taliban in Pakistan).

What is more, by the time Hossain tried to board his flight to Bangkok, he had a sophisticated primary plan to get to Afghanistan, as well as at least two contingency plans that he was actively exploring, all of which were designed to evade detection by law enforcement.  Thus,

42

by the time the defendant walked down the jet bridge to his flight, his plans for traveling to Afghanistan and joining the Taliban were quite developed and consistent with those of other foreign fighters who succeeded in joining terrorist groups to fight and kill. Had law enforcement not gained access to Hossain and thwarted him, there is every reason to believe he would have succeeded in executing his carefully crafted plot to join the Taliban and to help that group murder U.S. servicemembers.

In sum, Hossain's offenses were abhorrent and extremely serious. Over the course of many months, he engaged in a sophisticated plot to join the Taliban's jihad and kill Americans, and it was a stroke of good luck—that Hossain approached someone who was, unbeknownst to him, a source for the FBI—that likely saved American lives. A Guidelines sentence would reflect the seriousness of a U.S. citizen taking up arms against his country and trying to kill his fellow citizens; it would promote respect for the law; and it would be just.

### B. Affording Adequate Deterrence to Criminal Conduct and Protecting the Public from Further Crimes of Hossain Warrant a Guidelines Sentence

Affording adequate deterrence to criminal conduct and protecting the public from further crimes of Hossain further weigh in favor of a Guidelines sentence. *See* 18 U.S.C §§ 3553(a)(1), 3553(a)(3)(B)–(C). "General deterrence is essential here so that the severe consequences of choosing terrorism are apparent to all who might consider it." *United States v. Babafemi*, No. 13 Cr. 109, 2021 WL 1210313, at *6 (E.D.N.Y. Mar. 31, 2021). As Judge Walker has observed, "[i]n

no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life." *Stewart*, 590 F.3d at 181 (Walker, J., concurring in part).

The capacity of radical terrorist organizations to thrive hinges in significant part on their ability to grow their membership—to attract, indoctrinate, and enlist new followers, like Hossain, who are committed to advancing and serving the group's murderous agenda or dying in the attempt. Deterring such conduct is particularly important in today's environment, when many individuals in the West, including in the United States, have become radicalized by jihadist propaganda and have either traveled or tried to travel to the Middle East and Asia to join such groups. It is vital for our country's national security that other young men and women who reside in the United States, when exposed to hateful extremist teaching, be deterred from choosing to follow a path similar to Hossain's and engaging in potentially devastating conduct in support of such groups. It is important for those contemplating joining a terrorist organization to know that the consequences for such conduct are serious. And it is important for the public to know that those who seek to join and support terrorist organizations—and to kill U.S. servicemembers—will face serious punishment preventing them from causing harm to society. A Guidelines sentence is appropriate to serve the pressing need for general deterrence of such terrorism offenses.

Regarding specific deterrence and incapacitation, they are paramount considerations here. As the Second Circuit has held, terrorism crimes carry high recidivism rates and the rehabilitation of the defendants who commit them is notoriously difficult. *See Meskini*, 319 F.3d at 91-92 (noting the link between "the difficulty of deterring and rehabilitating" terrorism defendants and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time"); *accord Mumuni*, 946 F.3d at 113. Hossain's longstanding adherence to the radical Islamic

terrorist ideology of first al Qaeda and later the Taliban, his willingness to leave his wife and children behind to take up arms against his country and kill his fellow citizens, and his aspiration to commit the ultimate sacrifice, to martyr himself for the Taliban and its jihad, all support the conclusion that he is a deeply radicalized extremist, and that the deterrence of Hossain must be powerful and his incapacitation lengthy.

Further underscoring the need for specific deterrence and incapacitation is Hossain's continuing complete failure to accept responsibility for his actions. Notably absent from defense counsel's sentencing submission and the PSR is any expression of remorse by Hossain. The closest that he could muster was his admission that he and CS-1 "talked about things we shouldn't," which was immediately followed by his claim that CS-1 "took advantage of his compromised emotional state." PSR ¶ 44. The persistent theme from Hossain and defense counsel, which is insupportable and borders on offensive in light of the overwhelming evidence at trial, is that he was the real victim, not the U.S. servicemembers he plotted to kill or the other individuals he may have helped to radicalize, because he was manipulated by the Government and convicted of a crime he did not commit. *See id.* at 16 ("There was no discussion with Hossain about the case because he went to trial and asserts his innocence."). Based on Hossain's total unwillingness to reckon with his conduct, and his demonstrated radicalization and devotion to extremist ideology, there is every reason to believe that, once released, he will seek to resume his support for the Taliban or another foreign terrorist group that espouses the same sort of radical terrorist ideology. Moreover, at 36, Hossain is a relatively young man, and will still be capable of resuming his support for terrorism even after a lengthy term of imprisonment. The need to deter and prevent him from doing so for as long as possible cuts in favor of a Guidelines sentence.

**C.  A Guidelines Sentence Would Not Result in Unwarranted Sentencing Disparities**

Throughout the United States, terrorism defendants who have attempted to travel, successfully traveled, or assisted other individuals in traveling to join foreign terrorist groups have received substantial sentences, often the maximum term allowed by statute.  A Guidelines sentence in this case is consistent with the sentencing consideration of avoiding unwarranted disparities.

For example, in *Raishani*, discussed above, *see supra* at 39, the defendant pleaded guilty to one count of attempting and one count of conspiring to provide material support to ISIS, in violation of 18 U.S.C. §§ 2339B and 371.  Raishani had attempted to leave the United States to join ISIS but had been stopped by law enforcement before he was able to do so.  Raishani's Guidelines range was 300 months' imprisonment, the statutory maximum.  Judge Abrams sentenced him to concurrent sentences of 240 and 60 months' imprisonment, the statutory maximum penalty on each count.

Similarly, in *United States v. Alimehmeti*, No. 16 Cr. 398 (PAE) (S.D.N.Y.), defendant Sajmir Alimehmeti pleaded guilty to one count of providing and attempting to provide material support to ISIS, in violation of 18 U.S.C. §§ 2339B and 2, and one count of making a false statement in a passport application to facilitate an act of international terrorism, in violation of 18 U.S.C. § 1542.  Alimehmeti's Guidelines range was 360 to 540 months' imprisonment, the statutory maximum.  Judge Paul A. Engelmayer sentenced him to concurrent sentences of 240 and 264 months' imprisonment.

In *United States v. Farhane, et al.*, No. 05 Cr. 673 (LAP) (S.D.N.Y.), defendant Rafiq Sabir was convicted, following a jury trial, of one count of attempting and one count of conspiring to provide material support to al Qaeda.  Sabir's Guidelines range was 360 months' imprisonment,

the statutory maximum.   At sentencing, Sabir requested a sentence of only 60 months' imprisonment, claiming that he had been ensnared by a government sting operation.  Judge Loretta A. Preska sentenced Sabir to 300 months' imprisonment.

*Raishani*, *Alimehmeti*, and *Farhane* are but several examples.   Courts have routinely imposed sentences at or near the statutory maximum in numerous other cases involving defendants convicted of providing or attempting to provide material support for terrorism, by either attempting to travel or facilitating the travel of others to join a foreign terrorist group.  *See, e.g.*, *United States v. Zea*, No. 13 Cr. 72 (SJF) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Yemen to join al Qaeda in the Arabian Peninsula); *United States v. Pugh*, No. 15 Cr. 116 (NGG) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Syria to join ISIS); *United States v. Alaa Sadeh*, No. 15 Cr. 558 (SDW) (D.N.J.) (defendant sentenced to statutory maximum of 15 years' imprisonment for assisting another individual to travel to join ISIS overseas); *United States v. Clark*, No. 20 Cr. 76 (NRB) (S.D.N.Y.)  (defendant sentenced to statutory maximum of 20 years' imprisonment for disseminating large quantities of pro-ISIS propaganda and terrorist-attack training manuals in online chatrooms, participating and administering chatrooms, and exhorting other participants in chatrooms to commit "lone wolf" attacks in United States); *see also United States v. Kourani*, 6 F. 4th 345, 357–59 (2d Cir. 2021) (affirming district court's sentence of 40 years' imprisonment for defendant's conviction of various offenses, including providing and conspiring to provide material support to Hizballah, in part because sentence "simply reflects Congress' judgment as to the appropriate national policy for such crimes" (alterations and internal quotation marks omitted)).

47

In many of the foregoing cases, the defendants were convicted of only material-support offenses.  Here, however, Hossain was also convicted of an IEEPA violation, an extremely serious offense in its own right that is designed to further distinct policy objectives.  Hossain's sentence should reflect the fact that he was convicted of both Count One and Count Two.

Defense counsel's request for a sentence of no more than 72 months' imprisonment is completely out of line with the cases cited above and utterly fails to account for the gravity of Hossain's offenses.  In this regard, a recent decision from the Second Circuit is instructive.  In *United States v. Ceasar*, 10 F.4th 66 (2d Cir. 2021), the defendant "expressed her support for ISIS, encouraged others to join ISIS abroad, and helped individuals in the United States contact ISIS members overseas," who "then facilitated U.S.-based ISIS supporters' travel to ISIS-controlled territory." *Id.* at 68.  The defendant "herself intended to travel to ISIS territory by way of Sweden, where she planned to marry another ISIS supporter." *Id.*  Like Hossain, however, the defendant was stopped by law enforcement at JFK Airport before she could achieve her goal. *See id.*  The defendant ultimately pleaded guilty to one count of conspiring to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and one count of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1). *See id.*  The defendant's Guidelines range was 360 to 600 months' imprisonment. *See id.* at 69.  The court imposed a sentence of just 48 months' imprisonment, approximately 13% of the bottom of the Guidelines range. *See id.*

On appeal, the Second Circuit vacated the sentence and remanded for resentencing. *See id.* at 70.  The court's decision was based on several grounds, one of which was that, "in comparison with sentences for similar terrorism crimes, [the defendant's] sentence of 48 months' imprisonment was shockingly low and unsupportable as a matter of law." *See id.*  In reaching that

48

determination, the Second Circuit analogized to two other cases in which it had vacated a sentence and remanded for resentencing based on substantive unreasonableness: *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), in which the defendant had a Guidelines range of 360 months' imprisonment, but was sentenced to only 28 months' imprisonment; and *Mumuni*, 946 F.3d at 97, in which the defendant had a Guidelines range of 85 years' imprisonment, but was sentenced to only 17 years' imprisonment. *See Ceasar*, 10 F.4th at 80–82.

Additionally, the court surveyed "the sentences imposed in a handful of recent material support cases," which "illustrate[d] the unwarranted disparity reflected by the 48-month sentence imposed" by the district court. *See Ceasar*, 10 F.4th at 84. Specifically, the court cited *United States v. Naji*, No. 16 Cr. 653 (FB) (E.D.N.Y.), in which the defendant pleaded guilty to one count of attempting to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, based on his posting of violent, pro-ISIS content on social media and his travel to Yemen to join ISIS, and was sentenced to the statutory maximum of 240 months' imprisonment. *See Ceasar*, 10 F.4th at 84–85. The court also cited *United States v. Saidakhmetov*, No. 15 Cr. 95, 2018 WL 461516 (WFK) (E.D.N.Y.), in which the defendants each pleaded guilty to one count of conspiring to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, after one defendant was arrested at JFK Airport while attempting to travel to ISIS-controlled territory through Turkey, and the other defendant was arrested at his apartment shortly before embarking on similar travel. *See Ceasar*, 10 F.4th at 85. The defendants were each sentenced to the statutory maximum of 180 months' imprisonment. These are yet two more cases that, along with the reasoning in *Ceasar*, support the imposition of the applicable Guidelines sentence, at the statutory maximum, in this terrorism case.

### D.  Defense Counsel's Remaining Arguments Do Not Establish Mitigation

Lastly, the Government addresses defense counsel's remaining arguments, which do not establish meaningful mitigation supporting a variance, especially in light of all the other sentencing considerations discussed above.  First, the report from Dr. Edward Fernandez that defense counsel attached to their sentencing submission cannot bear the weight that defense counsel place on it.  Defense counsel argues that "Dr. Fernandez's conclusions are critical to fully understanding Mr. Hossain's mental state *at the time of the charged events*."  Def.'s Mem. 11 (emphasis supplied).  But Dr. Fernandez's report was based on two interviews of Hossain that he conducted in February 2022, just a few weeks ago—that is, almost *four years* after Hossain first approached CS-1, and more than *two-and-a-half years* after the defendant was arrested.

Further, the conclusions in the report are deserving of little if any weight given their highly conditional nature.  ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████  Such statements, largely amounting to speculation and coming years after the offense conduct, hardly supply a basis for leniency at sentencing in light of Hossain's crimes.

It is also important to keep in mind that all of the information on which Dr. Fernandez based his report came from Hossain or defense counsel.  The flawed factual premise on which Dr. Fernandez's report rests is exemplified by his comment about Hossain being provided "with extremist beliefs from individuals of whom he sought a sense of connectedness," which is an apparent reference to Hossain and defense counsel's untenable claim that CS-1 pushed extremism on Hossain and not the other way around.  Notably, Dr. Fernandez acknowledges that "the veracity of [Hossain's] statements," which almost wholly underpin his report, "remains largely unknown." *Id.* at 8.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████   But Hossain did not make a single or even a series of poor decisions over a short period of time.  To the contrary, over more than 10 months, he carefully and methodically planned the best way to kill Americans.  For example, he painstakingly saved $10,000 in small increments for weapons, *see* Tr. 117–18, 264–67, 823–26; GX 140, 209, 209-T, 217, 217-T, 222, 222-T, 534, 702 908; stockpiled mountain survival gear from multiple vendors, *see* Tr. 278–89, 317–29, 610–11, 618–21, 630–36; GX 141, 279, 279-T, 280, 280-T, 299, 299-T, 322, 322-T, 401, 402, 503, 902, 1013; and went to the gym every other day to prepare his body for jihad, *see* GX 202, 202-T.  In

light of this and other evidence, the explanation that defense counsel proffer for Hossain's repugnant behavior is no explanation at all.

Finally, the Government addresses defense counsel's argument that Probation's recommendation of a sentence of 300 months' imprisonment "neglects Mr. Hossain's perfect compliance with strict home incarceration for the nearly 16 months he was on pre-trial release." Def.'s Mem. 1; *see also id.* at 9 ("For nearly 16 months, Mr. Hossain was on bail without a single infraction. . . .  At no point was Mr. Hossain in violation of his release conditions . . . .").

The argument is meritless.  As a legal matter, the Second Circuit has held that "no substantially mitigating weight can be borne . . . by the fact that [a defendant] did what was plainly required of him—that is, behaving himself in prison. . . .  [H]is compliance with institutional regulations has no bearing on the sentencing factors a district court must consider under 18 U.S.C. § 3553(a)."  *Mumuni*, 946 F.3d at 112.  The same is true of Hossain's compliance with his bail conditions.  The fact that he did not commit more crimes or violate court orders while waiting to be convicted of terrorism and sanctions offenses at trial does not suggest that he should receive a reduced sentence for the crimes that he actually did commit.

Additionally, as a factual matter, Hossain's compliance with his bail conditions is undermined by his recent conduct in prison.  On January 19, 2022, Hossain incurred a major violation for conduct that disrupts or interferes with the security or orderly running of the correctional facility and a minor violation for refusing to obey an order of staff, when Hossain was combative with prison staff and even spit at corrections officers.[4]  Unsurprisingly, Hossain fails to

---

[4] The reports of the incident are attached hereto as Exhibit A.

52

accept responsibility in his submission for the incident and attempts to blame others, just as he did for the gravely serious crimes of which a jury convicted him.  Those crimes, and the array of sentencing factors discussed above, support a Guidelines sentence, and neither Dr. Fernandez's report nor Hossain's behavior while on pretrial release do anything to change that.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should sentence Hossain to a Guidelines sentence of 420 months' imprisonment, which would be sufficient but not greater than necessary to comply with the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).

Dated:  New York, New York
        March 7, 2022

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney for the
                                        Southern District of New York

                        By:     _____
                                        Benjamin Woodside Schrier
                                        Assistant United States Attorney
                                        (212) 637-1062